**Curtis Edward McCARTY, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

No. F–89–1057.

Court of Criminal Appeals of Oklahoma.

Sept. 12, 1995.

David Autry, Norman, Don Ed Payne, Hugo, for appellant at trial.

Robert H. Macy, Barry Albert, Oklahoma City, for State at trial.

Jamie D. Pybas, Assistant Appellate Public Defender, Norman, for appellant on appeal.

Susan Brimer Loving, Attorney General of Oklahoma, Dan Connally, Assistant Attorney General, Oklahoma City, for appellee.

### *OPINION*

STRUBHAR, Judge:

The homicide in this case occurred in the early morning hours of December 10, 1982. Almost three and one half years later on March 17–26, 1986, Appellant was tried by a jury in the District Court of Oklahoma County, Case No. CRF–85–2637. Appellant was convicted of First Degree Murder and sentenced to Death. This conviction was appealed to this Court in Case No. F–86–343. In an opinion handed down in December of 1988, Appellant's case was reversed and remanded for a new trial based upon numerous trial errors. *McCarty v. State,* 765 P.2d 1215 (Okl.Cr.1988). Appellant was retried in September of 1989, almost seven years after the crime was committed. Again, the jury found him guilty of First Degree Murder and assessed punishment at Death. Appellant was sentenced accordingly. It is from this Judgment and Sentence that Appellant has perfected his appeal to this Court.

### FACTS

On December 5, 1982, due to marital problems, Dale Coffman moved out of the house that he shared with his wife Melanie Coffman. On that same day, Pam Willis moved into the house with Melanie. Close to 1:15 a.m. on December 10, 1982, Dale called the house to talk with Melanie, but when the phone was answered no one spoke. He hung up and called again. This time he heard a woman's voice on the other end call out "help" or "Dale, help me."[1] After this, Dale drove by Melanie's house and noticed the lights were on and Pam's car was in front but Melanie's car was not there. He did not go inside, but went first to a nearby convenience store and called the house to see if Melanie was there. No one answered the phone. After he drove back to the house, Dale

---

1. Trial Transcript Vol. III, pp. 51–52.

walked to the front porch where he noticed that one of the windows to the side of the front door was broken. He looked through the front door window into the house and saw nothing. Dale walked to the side of the house and looked into the side windows where he observed a pair of bare legs on the floor between the dining room and the kitchen area. Because he could not see the rest of the person he did not know who it was. He ran back to the front porch and beat on the door but no one responded so he ran to get help. Dale called the police from a neighbor's home and then waited for them to arrive. The police arrived at around 2:00 a.m., within three or four minutes of the call. One of the officers kicked in the front door and entered the house. Dale followed and observed the naked body of a woman laying on the floor. Because her face was covered Dale was unable to identify her. However, she was eventually identified as Pam Willis. Pursuant to subsequent investigation Appellant was arrested and charged with the murder of Pam Willis. Additional facts will be discussed as necessary in the following propositions of error.

## PRETRIAL ISSUES

■ In his tenth assignment of error, Appellant argues the trial court improperly restricted his questioning of jurors during voir dire. Appellant complains defense counsel was prohibited from asking potential jurors to speculate about circumstances they would consider to be mitigating. This Court has, in the past, upheld a trial court's ruling prohibiting this line of questioning, finding that such ruling was not an abuse of discretion. *See Fox v. State*, 779 P.2d 562, 569 (Okl.Cr. 1989), *cert. denied*, 494 U.S. 1060, 110 S.Ct. 1538, 108 L.Ed.2d 777 (1990). We are not now persuaded to hold otherwise, especially in light of the fact that defense counsel was able to determine, through proper questioning, whether the jurors could follow instructions to consider mitigating evidence.

Appellant also argues defense counsel was improperly restricted from questioning the potential jurors regarding the strength of their opinions on the death penalty. A review of the record does not support this assertion. Defense counsel was prohibited from informing the jurors that if they could not agree upon a verdict of death, the trial court would sentence Appellant to life. However, defense counsel was not prohibited from discussing with the jurors the strength of their opinions about the death penalty. This proposition is without merit.

■ Appellant argues in proposition eleven that the trial court erred when it refused defense counsel's request to voir dire the jurors individually because of extensive pretrial publicity concerning this case. This Court has noted there is no right to sequestered, individualized questioning during jury selection although such may be allowed at the discretion of the trial court. *Cannon v. State*, 827 P.2d 1339, 1341 (Okl.Cr.1992). Further, "[t]he existence of extensive pretrial news coverage does not itself demand individual or sequestered voir dire.... The crux of the issue is whether defendant can receive fair and impartial jurors." *Vowell v. State*, 728 P.2d 854, 858 (Okl.Cr.1986).

■ The record reflects that at the time defense counsel argued the motion to have jurors questioned individually on the question of pretrial publicity, counsel acknowledged there had not been much recent publicity concerning this case. Rather, counsel's request was based upon concern that jurors might remember publicity from the first trial in 1986. The trial court ruled that while he would not start out with individual voir dire, he would conduct individual voir dire if something occurred which indicated such to be necessary. Indeed, the record reflects the trial court did follow through with this ruling. At the beginning of the second day of voir dire, defense counsel called to the trial court's attention that one of the television news stations had run a story on the case the preceding night. Defense counsel requested the trial court to ask the jurors as a whole if they had seen the story and then question individually those who indicated that they had. The trial court complied with this request. From this, it appears the trial court proceeded in a way which allowed defense counsel to adequately determine whether potential jurors had been prejudiced by pretrial

publicity. We find the trial court did not abuse its discretion in so ruling.

## FIRST STAGE ISSUES

■ Appellant argues in his first proposition that the evidence presented at trial was insufficient to support his conviction for First Degree Murder. In support of this argument, Appellant directs this Court's attention to much of the circumstantial evidence introduced at trial. Appellant approaches this proposition by discussing separately each portion of evidence and how it falls short of proving his guilt. He first complains about the testimony of forensic chemist Joyce Gilchrist concerning the hair comparison analysis. Gilchrist testified that sixteen scalp hairs and one pubic hair found at the scene of the homicide were consistent with Appellant's hair and therefore, could have come from him. She also testified that a single fragment of scalp hair removed from the screen that had been pulled back from the window in the bedroom exhibited similarities to Appellant's scalp hairs. However, because of the damage to this hair, no meaningful conclusion could be reached. Appellant argues this evidence was not inconsistent with innocence for several reasons. He first notes that Gilchrist acknowledged hair comparison cannot be used to make positive identification. Further, because Appellant had admittedly been in the house on several occasions prior to the night of the homicide, he argues that evidence of his hair being found at the crime scene does nothing to support the State's case establishing his presence in the house at the time the homicide was committed.

The limited value of hair comparison evidence was discussed at length during trial. While Gilchrist readily acknowledged hair comparison cannot be used to make positive identification, she also noted that it can positively exclude persons as donors of the hair. In fact, she testified that no hairs found in the residence or on Willis' body could have been deposited by several other persons who had provided hair samples, including Willis' boyfriend, Kevin Bowser, and Melanie Coffman's husband, Dale, both of whom had either spent time at the house or around Willis

shortly before the homicide. Further, one of the scalp hairs which Gilchrist testified was consistent with Appellant's scalp hair was found inside a knife wound on Willis' body. The jury may reasonably have found this testimony probative as to the issue of whether Appellant was present at the time the crime was committed. Accordingly, while the testimony regarding hair comparison analysis is not dispositive, it is not insignificant.

Appellant also argues that flaws in the chain of custody concerning the hair evidence render its reliability highly suspect. He specifically refers to discrepancies between Gilchrist's forensic report and her testimony regarding a pubic hair found on Willis' chest. At trial Gilchrist testified this hair was consistent with pubic hairs taken from Appellant. However, in her forensic report she initially noted that the hair was inconsistent with hairs taken from either Willis or Appellant. This discrepancy was discussed at trial where Gilchrist explained that it was due to a typographical error made by her secretary which she failed to notice prior to signing the forensic report. She testified that her work notes reflected the pubic hair at issue was consistent with those submitted by Appellant. Gilchrist amended her forensic report prior to trial to correct this typographical error. She discussed this discrepancy both during direct examination and cross examination. Defense counsel thoroughly questioned her about the error, affording the jury an opportunity to consider the discrepancy when determining the reliability of her analysis.

Next Appellant complains the serological evidence presented at trial did not eliminate every reasonable hypothesis except that Appellant had been the donor of the semen found at the crime scene. Gilchrist testified Willis and Appellant had the same blood type and secretor status and they shared common genetic markers with the exception of two. Even so, she could not say Appellant was the donor of the semen; he simply could not be eliminated as such based upon the blood analysis. However, neither could a number of other persons tested, including Kevin Bowser, Dale Coffman, Rick Terry, and Shawn McCarthy. Accordingly, if the sero-

logical evidence was the only evidence presented at trial which purported to connect Appellant with the commission of the crime, it clearly would be insufficient to do so. However, this was but a small portion of the evidence presented and while it did not connect him to the crime scene, neither did it exclude him.

Similarly, Appellant challenges the relevance of testimony concerning a cigarette butt found floating in the toilet at the house where Willis was killed. Gilchrist testified that several persons could not be excluded as donors of antigens detected on the cigarette butt, one of which was Appellant. Again, this testimony did not necessarily connect Appellant to the crime scene.

Appellant also argues that while a fingerprint found on the base of the vase on the coffee table did indicate he had been in the residence, it did not connect him to the commission of the crime. Appellant admitted having been in the house several times in the past, most recently the day before Willis was killed. Appellant's argument concerning the limited value of this evidence is supported by the testimony of the fingerprint analyst, John Hill, who could not testify as to how long the print had been on the vase before it was lifted. He also could not say that if the vase had been wiped with a cloth, as Melanie Coffman claimed to have done the morning of the day Willis was killed, the print would have necessarily been removed. Accordingly, Appellant contends this evidence did not establish his presence at the house at the time the homicide occurred.

The State presented evidence that the rope found wrapped around Willis' neck was like those that had been manufactured for the Air Refiners Plant where Appellant had been employed in 1982. Appellant argues the evidence concerning this rope was not conclusively connected to him. Again, this is true. Although like ropes had been seen laying about at the plant where all employees had access to them, there was also testimony that the ropes and clips attached to the ropes could be purchased by the general public and the devices were not patented.

Appellant also discusses evidence presented by the State that on the night Willis was killed, Appellant was driving his white Volkswagen and it broke down leaving him stranded. Yolanda McCarthy, a friend of Appellant's, testified about a telephone conversation with Appellant she thought to have occurred around the last of 1982 or the first part of 1983. She later testified that she thought the phone call occurred before Christmas. Appellant called Yolanda some time after 10:00 at night from a Circle K Store on the outskirts of Moore because he was stranded and needed a ride home; his car had broken down. He told her that a girl had been killed over drugs and he didn't want to stay at the store very long because he would be seen by either the person at the store or by the police. Because she could not help him she told him to call Cindy Parks. Yolanda recalled Appellant's Volkswagen as being light blue or white.

Cindy Parks testified that on December 10, 1982, she received several calls from Appellant after 2:00 a.m. asking for help with his car which had broken down. Appellant was calling from a convenience store and told Parks he was afraid the clerk would remember him because he kept using the phone so much. Parks testified Appellant sounded nervous but she did not know why. She told Appellant she would call a friend who knew about cars to go help him. Parks called Anna Haakonson who agreed to go help Appellant. At school the next day Parks learned Willis had been killed the night before.

Anna Haakonson testified she received a phone call from Cindy Parks between 2:00 and 3:00 a.m. on a rainy and cold week night in 1982, and Parks asked her to go help push Appellant's car home. Anna rode with her brother Olaf in his truck to Appellant's car which was at S.W. 89 & Santa Fe. They pushed the light blue Volkswagen to a house in Moore.

Olaf Haakonson testified he went with his sister Anna on a winter night to S.W. 89th & Santa Fe to push a car. He could not identify Appellant as the person whose car they pushed. Olaf noticed a crinkle in the back of the Volkswagen above the bumper. The car appeared to Olaf to be light blue. Olaf testi-

fied the car would not run for very long periods so he pushed the car to a location in Moore.

The effect of this testimony was to place Appellant in the general vicinity of the homicide on the night it occurred and to circumstantially connect him to the commission of the crime by virtue of Yolanda's testimony that he had referenced the death of a girl and his fear of being recognized in the convenience store. Appellant argues this testimony was wholly unreliable because of the various inconsistencies in the testimony of these witnesses. Although Cindy Parks' testimony that the telephone call from Appellant occurred on the night Willis was killed remained consistent, other witnesses were not able to testify with equal certainty as to the night his car broke down. Defense counsel ably cross-examined these witnesses about their varying accounts of when this event occurred.

Appellant also argues the testimony of these witnesses was insufficient to connect him to the commission of the crime because there was evidence that he did not own a blue Volkswagen at the time of the homicide and the white Volkswagen that he did own was inoperable because his girlfriend had smashed in the back of the car. Yolanda McCarthy testified she recalled Appellant's vehicle as being light blue or white. Cindy Parks testified Appellant had owned both a light blue and a white Volkswagen and she wavered in her recollection of which he was driving at that time. Anna Haakonson recalled Appellant's car as being light blue on the night she and her brother had pushed it. Olaf Haakonson recalled Appellant's car to be light blue with a crinkle in the back. Again, the inconsistent testimony of these witnesses regarding the color of Appellant's car was revealed on cross examination by defense counsel. Although Appellant maintains on appeal the State did not refute the evidence that his white Volkswagen was inoperable at the time of the homicide, this fact was contradicted by Appellant himself in one of the statements he made to the police.

Next Appellant attacks the sufficiency of his own statements to connect him to the commission of this homicide. He argues the statement attributed to him by Yolanda McCarthy failed to connect him to the homicide because the year and date of this phone call were in question and concerned an unnamed person. He claims that at best, the statement indicated a knowledge of the offense but not participation.

He argues the testimony of another witness, Gerald Griffin, concerning a telephone conversation between the two of them was equally inconclusive. Griffin testified he spoke to Appellant in September of 1983 about the murder of a girl. Appellant told Griffin he had known a girl who wanted to buy acid so he took another friend to her house to sell her the acid. Appellant and his friend left the house but his friend returned to the house and killed the girl after she overdosed or "freaked out." Again, he points out that this statement does not connect him to the actual commission of the crime.

Cindy Parks testified at trial she had a conversation with Appellant at her parent's house between Christmas and New Year's Eve in 1982 where he told her the police put out the wrong information about Willis' death. Parks testified Appellant said he had been paid to kill Pam Willis for "burning" someone on a drug deal. Appellant told her he had gone in the house alone while Willis was sleeping and had slashed her throat, but had not sexually assaulted her, and smoked a cigarette and then left. Appellant was worried he had left his fingerprints on a knife drawer he had leaned against. He also told her he stole a necklace and a purse from the house. Appellant points out this story is not consistent with known facts of how Willis was killed.

Appellant also attacks the testimony of Theodore Elgin, the convicted felon who testified that while in the Oklahoma County Jail, he heard Appellant discussing with other inmates the murder of a girl. Appellant argues this testimony was inherently unreliable. Although Elgin testified he had not made any agreements with the District Attorney's office in exchange for his testimony, pending felony charges against him in Oklahoma County were dismissed.

Appellant finally argues the numerous statements given by him to the police do not tie him to the Willis homicide as either the killer or a principle to the offense. Appellant was first interviewed by the police on March 15, 1983. During this interview, he told them that the night before Pam was killed, he had received a phone call from Melanie Coffman requesting that he obtain some acid for Pam. While he was trying to make a connection to get the acid, Chas Kelly and Shawn McCarthy came to his residence. The three left his residence and went to the house on 39th Street where Willis was staying to deliver the acid. They were there a short time and left to go to band practice at the studio on Classen that evening.

Appellant gave another statement on March 6, 1985. He was represented by counsel during this interview and it was transcribed by a court reporter. The transcript of the interview was also admitted into evidence. During this interview, Appellant's account of his activities on December 8, 1982, was the same as he had stated in the previous interview. Appellant stated that at 6:00 p.m. the day Pam was killed he was with a friend named Steve. Around 7:00 or 8:00 he and Steve went to Pam's house with the intention of selling her more acid, but they did not make a sale. Pam told him she was going to buy some acid from Shawn later that night. They left the house and he drank some beer and did some drugs and then Steve took him home where he went to bed. In this interview Appellant did not indicate he had gone to band practice that night. He speculated that Shawn had killed Pam because she burned him on the drug deal. He also stated he found out Pam had been killed early the next morning when Terrie Calvary called him between 5:00 and 7:00 a.m. Appellant denied making any phone calls from a pay phone that night to get someone to come pick him up. He stated he called several people to talk about Pam Willis after she had been killed. He claimed he had a reputation of knowing everything that was going on and he admitted he had told people he knew who killed Pam but he was just guessing.

On March 7, 1985, Appellant was interviewed again and the interview was recorded by a court reporter. He was again represented by counsel and he was advised of his rights under *Miranda*. Once again, Appellant was consistent in his recount of the events of December 8, 1982. He and Rick Terry, his drug connection, went to Pam's house. He intended to set Terry up with Pam so Terry could get sex from Pam in exchange for drugs. Appellant, by setting this up, could get extra drugs. After he took Terry over to Pam's, Appellant left. Appellant told the police he was driving his white Volkswagen which ordinarily would not run but did that night. He said that it was raining and his car stalled when he was going back to Pam's house. He called over to Pam's and spoke with Terry who told him he had gone to the bathroom and Pam had gotten into his bag of money and drugs. Terry told Appellant to keep his mouth shut. When Appellant was asked if he called Cindy Parks he said that he had. Appellant volunteered that Cindy did not come pick him up, but she called a friend of hers who came with her brother. He did not remember her name but remembered that she had blond hair.

Appellant argues that much of what he stated to the police conflicted with facts of the homicide. He points out that his claim that Rick Terry was the killer proved to be false. It is Appellant's position that these statements, in their most damaging light, place him at the scene of the crime but do not indicate he participated in the murder.

▮ The foregoing discussion amply demonstrates the evidence relied upon by the State to convict Appellant was entirely circumstantial and the jury relied upon inference to convict Appellant of the crime charged.[2] Accordingly, Appellant's conviction can only be sustained upon a finding that the evidence presented at trial, when viewed in the light most favorable to the prosecution, excludes every reasonable hypothesis except that of guilt. *Billey v. State*, 800 P.2d 741,

---

2. The prosecution basically conceded in closing argument the circumstantial nature of the evidence presented during trial.

743 (Okl.Cr.1990). However, the State is not required to exclude every conceivable hypothesis or negate any possibility other than guilt. *Romano v. State,* 847 P.2d 368, 378 (Okl.Cr.1993), *aff'd,* —— U.S. ——, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994). In deciding this issue, this Court must consider and examine the record as a whole. *Id.* Further, the jury is the exclusive judge of the weight and credibility of witnesses' testimony, and a reviewing court must accept those credibility choices and reasonable inferences that tend to support the verdict. *Id.* at 379. When all of the evidence is reviewed as a whole, in the light most favorable to the State, Appellant's argument that the evidence was insufficient to support his conviction loses its impetus. The jury could reasonably have found that the evidence excluded every reasonable hypothesis except that of Appellant's guilt. This proposition is without merit.

■ In his second proposition, Appellant contends that the statements he made to the police should have been excluded from evidence because they were secured in violation of his rights under the United States Constitution, and the Oklahoma Constitution.

Appellant was interviewed by the police and gave separate statements on March 6, 7 and 11, 1985. Although he never admitted to killing Willis, he told differing stories about what happened on the night Willis was killed. Defense counsel argued against the admission of these statements at a hearing on a motion to suppress. This motion was overruled and the statements were allowed into evidence at trial. Appellant argues on appeal that the trial court's ruling on this motion was in error.

It was established at trial that on March 5, 1985, Appellant was approached by Oklahoma City Police Lieutenant Sellers at the Oklahoma Envelope Company where he worked. Appellant accompanied Sellers to the police station for an interview. Once at the police station, he was interviewed by Eddie Thomason, an investigator with the Oklahoma County District Attorney's Office. Thomason testified that he advised Appellant of his *Miranda* rights before the interview on March 5, 1985. During this interview, Appellant indicated he wanted an attorney and the interview was terminated. The following day, on March 6, 1985, Appellant was again interviewed. This time, however, he was represented by counsel and his statement was recorded by a court reporter. Appellant's own counsel asked him questions first and the police then, in effect, cross-examined him. Appellant was not advised of his *Miranda* rights on this date. However, the following day, on March 7, 1985, Appellant was advised of his *Miranda* rights before he gave a second statement which was again given in the presence of his counsel.

Appellant first argues that his statement of March 6, 1985, should not have been admitted into evidence because it was the product of a custodial interrogation and had not been made knowingly and voluntarily as he had not been apprised of his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). While the record supports Appellant's assertion that he was not read his *Miranda* rights on March 6, 1985, it also indicates that this interview was preceded by circumstances which render this omission harmless. Appellant had been apprised of his *Miranda* rights just one day earlier and he exhibited at that time that he understood these rights when he requested an attorney. When Appellant was interviewed on March 6, 1985, this occurred with the assistance of his attorney. Under these circumstances, the conclusion that Appellant's statement of March 6 was made by him unknowingly and involuntarily simply because he was not again advised of his rights is illogical. The record supports the conclusion that the statement of March 6, 1985, was knowingly and voluntarily made by Appellant with the assistance of counsel. Accordingly, Appellant's argument that his subsequent statements should also have been suppressed because they were tainted by the statement of March 6, 1985, is also without merit.

■ Appellant next contends that all three statements were given involuntarily because they were obtained by threats and conditioned upon promises of immunity, fair deals and leniency. Indeed, the record does support Appellant's assertion that promises were made to him. The district attorney initiated the first interview by promising Appellant

that if he told the truth about what he knew of the homicide, Appellant would not be charged with anything short of murder.

While promises of leniency are certainly to be considered in determining whether a statement was given voluntarily, such are not necessarily dispositive of the issue.[3] Rather, a determination of voluntariness must be made by a review of the totality of the surrounding circumstances, including the characteristics of the accused and the details of the interrogation. *Schneckloth v. Busta-monte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Turner v. State*, 803 P.2d 1152, 1158 (Okl.Cr.1990), *cert. denied*, 501 U.S. 1233, 111 S.Ct. 2859, 115 L.Ed.2d 1026 (1991). In the present case, the following factors are relevant: Appellant had been advised of his *Miranda* rights the day before the first transcribed statement was taken, he exhibited that he understood these rights as he requested the assistance of counsel, his attorney was present during both transcribed statements, and his attorney participated in the interview by asking him questions. This record does not support a finding that Appellant made the statements because his will was overborne by promises made to him by the Assistant District Attorney.

Appellant also argues his statements were involuntary because the police informed him they were going to have Rick Terry in custody soon when in fact they were not. Again, while this may be a factor to consider, it does not tip the scales in Appellant's favor on this issue. A review of the totality of the circumstances supports the conclusion that Appellant's statements were made voluntarily.

Finally, Appellant argues his statements were inadmissible because they were given following an illegal, investigatory, pretextual arrest which was not based upon probable cause. Appellant contends that when he was picked up by police and taken to the station for questioning, he was at that time illegally placed under arrest. The record does not support this conclusion. "If there is no manual seizure or any resistance, the intentions of the parties are very important. [In order to have an arrest] [t]here must be an intent to arrest by the officer and an understanding by the arrestee that submission is necessary." *DeVooght v. State*, 722 P.2d 705, 708 (Okl.Cr.1986). While the police officers may have intended to arrest Appellant had he not gone with them voluntarily, they did not necessarily consider him to be under arrest when he voluntarily accompanied them for questioning. Further, there is no indication from the record that Appellant believed himself to be under arrest or that he was led to believe that he was not free to leave. Accordingly, we do not find that Appellant was under arrest when he was first questioned by police on March 5, 1985.

However, after the March 5 interview with Appellant was terminated, he was booked into jail as a material witness.[4] It does not appear from the record that the police had a warrant to arrest Appellant as a material witness. Probable cause to believe a person is a material witness to a homicide is not authorized as a justifiable precedent for warrantless arrest.[5] Further, the statutory authority which allows material witnesses to be arrested provides for such upon the issuance of a warrant.[6] Accordingly, it appears that Appellant's warrantless arrest

3. In recent cases where defendants claimed to have been induced into making a statement by promises of immunity, the voluntariness of the statements was determined by a review of the totality of the circumstances. *See U.S. v. Matthews*, 942 F.2d 779, 782 (10th Cir.1991); *United States v. Garot*, 801 F.2d 1241, 1244–45 (10th Cir.1986).

4. The record indicates that Appellant was additionally booked on charges stemming from outstanding traffic warrants. When Lieutenant Sellers went to see Appellant at his workplace in March of 1985 about this homicide, he checked to see if Appellant had any outstanding warrants

so that Appellant could be taken into custody. Under the circumstances of this detention and arrest, it seems clear that Appellant's arrest on the traffic charges was pretextual; it was a reason to hold him for questioning concerning the homicide, not simply as a matter of procedure to investigate the traffic violations. *See Lyons v. State*, 787 P.2d 460 (Okl.Cr.1989). Accordingly, this discussion will be limited to the validity of Appellant's arrest for being a material witness.

5. *See* 22 O.S.1981, § 196.

6. 22 O.S.1981, § 274.

as a material witness may well have been illegal.

▪ Even if Appellant's arrest was illegal, it was not necessarily error for the trial court to admit into evidence the statements made during his unlawful detention; if the statements were purged of the taint of the illegal arrest they can be found to have been properly admitted into evidence. Again, the inquiry turns to whether Appellant's statements were made voluntarily. In determining whether the taint of the unlawful arrest has been purged, several factors must be considered: whether the *Miranda* warnings were given, the temporal proximity of the arrest and the statements, any intervening circumstances, and the purpose and flagrancy of the official misconduct. *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Cooks v. State,* 699 P.2d 653, 657 (Okl.Cr.), *cert. denied,* 474 U.S. 935, 106 S.Ct. 268, 88 L.Ed.2d 275 (1985).

It appears the police specifically arrested Appellant unlawfully for the purpose of questioning him about this homicide. However, as has been noted above, Appellant was advised of his *Miranda* rights on March 5, 1985, prior to being questioned. He exhibited that he understood his rights as he requested the assistance of counsel. The statements which were offered into evidence were made by Appellant after he had obtained the assistance of an attorney. Appellant's request for counsel and the compliance with this request operated as an intervening circumstance which purged the primary taint of the unlawful arrest. Accordingly, the statements made by Appellant were properly admitted into evidence at trial.

▪ Appellant's third assignment of error asserts he was deprived of his constitutional rights to a fair trial and a fair sentencing hearing by pervasive and improper tactics, remarks, and arguments by the same prosecutors that caused this court to reverse his conviction after the first trial.[7] Appellant first complains the prosecutor misstated and misrepresented the evidence and argued facts not in evidence. He specifically argues that the prosecutor, in both opening and closing argument, represented to the jury that the serology and hair evidence positively identified Appellant as being physically present at the scene when the homicide occurred. As discussed above, the serology and hair evidence, taken alone, did not positively identify Appellant as the perpetrator of this crime. When the arguments of the prosecution are read in context and reviewed as a whole, it appears that the prosecutor did not misrepresent this evidence to be more dispositive than it actually was. Rather, the prosecutor asked the jury to consider all of the evidence presented. He noted there was much circumstantial evidence presented in this case, and he discussed all of it, including the serology and hair evidence. He then asked the jury to deduce from all of the evidence that Appellant was in the house on the night of the murder. While a few of the prosecutor's comments, taken alone, may have bordered upon impropriety, we find that the argument as a whole was not so improper as to have infringed upon Appellant's rights. Rather, this argument fell within the prosecution's wide latitude to discuss freely, from the State's standpoint, the evidence and reasonable inferences and deductions arising therefrom. *Shelton v. State,* 793 P.2d 866, 871 (Okl.Cr.1990).

▪ Appellant also contends the State improperly commented on the failure of defense to call expert witnesses. Prior to trial, the forensic evidence which had been examined by Gilchrist was sent to experts retained by the defense for independent analysis. Defense counsel opted not to call an expert witness to testify regarding the results of this independent analysis. Over defense objection, the prosecutor elicited on direct examination from Gilchrist that the forensic evidence had been sent to experts retained by the defense. Then, during first stage closing argument, again over the objection of defense counsel, the prosecutor brought this to the attention of the jury stating that if Gilchrist had made a mistake in her analysis,

---

7. Because this case must be remanded to the district court for resentencing due to error alleged in Proposition XII, no instances of prosecutorial misconduct alleged to have occurred in the second stage of trial have been discussed.

an expert for the defense would have testified accordingly at trial.

▉ Appellant argues the prosecutor's comments on the conclusions drawn from the failure of defense to call an expert witness, constituted reversible error. This Court has held it improper for a prosecutor to comment on a defendant's failure to call certain witnesses where such comment was misleading or drew improper conclusions from outside the record. *See Thompson v. State*, 462 P.2d 299, 304–05 (Okl.Cr.1969); *White v. State*, 726 P.2d 905, 907 (Okl.Cr.1986). However, "the general rule in Oklahoma is that where a person might be a material witness on a defendant's behalf and the accused neither places him on the stand nor accounts for his absence, failure to produce him as a witness is a legitimate matter for comment during the State's argument." *Trice v. State*, 853 P.2d 203, 214 (Okl.Cr.), *cert. denied*, —— U.S. ——, 114 S.Ct. 638, 126 L.Ed.2d 597 (1993).

In this case, it was established on the record that experts selected by the defense had analyzed the same forensic evidence as Gilchrist. The defense sought to establish that Gilchrist's conclusions regarding the analysis of this evidence were unreliable. It was a fair inference that had the defense experts arrived at any other conclusions regarding the analysis of this evidence they would have been called by the defense to testify. Accordingly, the prosecutor's argument in this regard was not misleading nor based upon facts outside the record.

▉ It is next alleged that the prosecutor improperly denigrated Appellant and voiced personal opinions of his guilt. None of the comments of which Appellant specifically complains were met at trial with contemporaneous objection. Accordingly, all but plain error has been waived. *Freeman v. State*, 876 P.2d 283, 287 (Okl.Cr.), *cert. denied*, —— U.S. ——, 115 S.Ct. 590, 130 L.Ed.2d 503 (1994). Many of the comments at issue fall within the wide range of permissible argument. None were so egregious as to have risen to the level of reversible error.

Appellant also complains of numerous comments made by the prosecutor which he contends were designed to incite sympathy for the victim, invoke societal alarm, and encourage the jury to convict Appellant based upon the prosecutor's personal sense of justice. The first stage comments at issue were not objected to at trial. Because these comments did not constitute plain error, no relief is warranted.

▉ In his fourth proposition of error Appellant argues that impermissible judicial intervention into the deliberative process unduly coerced the jury into reaching a verdict in violation of appellant's Sixth and Fourteenth Amendment rights to a fair and impartial trial and his right to a unanimous jury verdict under Article II, Section 19, of the Oklahoma Constitution.

After it had deliberated for approximately seven and a half hours at the conclusion of the first stage of trial, the jury sent the trial court a note which indicated they were unable to agree upon a verdict. The judge responded to the jury's· note by giving them the stock *Allen* charge as set forth in the Oklahoma Uniform Jury Instructions.[8] Defense counsel acknowledged that this instruction accurately stated the law, but argued it was unduly coercive and should not be given. He requested a mistrial. The objection and request for mistrial were overruled.

Approximately seven hours later, the jury foreman sent the trial court another note which stated:

> Judge Parr: We have deliberated for approximately 15 hours and here is the situation: I am the only juror left who still holds to the verdict that I do, the few others who believed what I do have now changed their vote. [A portion of the note was erased here.] We have talked & talked, discussed, argued, concurred, etc. *diligently* and *seriously* now for quite some time. I still sincerely and in good conscience am holding to my conviction and do not feel that no matter how much the other jurors are convinced & try to convince me, I do not feel that I will be able to change my belief. Yet I also cannot change the minds of 11 fellow jurors.

8. OUJI–CR 910.

I realize the seriousness & expenses of these proceedings thus far and do not take this lightly in any manner. It seems to be that if (and I don't know that we are) we are required to stay here & deliberate until we reach a unanimous decision, that that can *not* happen unless I change my decision simply because of the opinions of the other jurors and simply to arrive at a decision. Of course, I have given serious & open-minded consideration to the interpretations and opinions of the others but I still could not, in good conscience, change my mind. I have also presented to the other jurors my reasons for my decision, which to me are valid reasons but they do not agree. Having listened to all their discussion, I agree on some matters but not on others, not *enough* to change my decision. What are your instructions? [9]

Upon receiving this note, defense counsel again moved for a mistrial. The trial court did not grant his request but instead asked a few questions to the jury foreman. The following exchange occurred:

COURT: Has the jury reached a verdict.

FOREMAN: No, sir.

COURT: Now, we have the note here written on the yellow tablet paper. Do you think that further deliberation in this case will be fruitful?

FOREMAN: No, sir.

COURT: What about your fellow jurors? Do they—

FOREMAN: They're of the same opinion.

COURT: Will everyone on the jury that agrees with the statement of Mrs. Glatt please raise your hand.

(No response from jurors.)

FOREMAN: Would you ask the question again?

COURT: The question for the jury is, I want to find out if everyone is in agreement, that you don't think it's possible to reach a verdict. That's what the foreman has told me, that she does not feel that it's possible for the jury to reach a verdict. And since you've all been up there deliberating, do you all think that that is correct, that that is right, that that is true? If you believe that to be correct, please raise your hand so we can get some idea of how the jury feels about it.

(No response from jurors.)

COURT: Well, no one has raised their hand, so apparently nobody agrees with the statement.

FOREMAN: Let's go deliberate.

(Jurors speak to each other out of hearing of court reporter.)

FOREMAN: Okay. We'll go back.[10]

At this point, defense counsel and the prosecutors met at the bench outside the hearing of the jury. The trial court expressed surprise that none of the jurors had responded to his question. He speculated that the holdout juror must be the foreman. A prosecutor stated that they were wasting their time and the trial court and defense counsel agreed. The trial court then suggested that he question the foreman to see if she had written the note. The prosecution thought this a good idea, but defense counsel objected, not wanting to single her out. One prosecutor suggested that they allow the jury a dinner break and then send them back into deliberations. In response, defense counsel suggested that the problem cold not be resolved by simply taking a break in light of the content of the juror's note which indicated that if the juror's vote was changed, it would be to make the verdict unanimous, not because he/she had changed his/her mind. Defense counsel suggested this would undermine the validity of the verdict, and he renewed his motion for a mistrial. The trial court then decided to ask the jury foreman one more time whether she thought it possible for the jury to reach a verdict. If she said it was not, the judge agreed to grant a mistrial. However, if she said that they could go back and deliberate, he agreed to allow them to do so. After this discussion at the bench the following transpired in open court:

COURT: Mrs. Glatt, again, do you feel like that the jury can reach a verdict in this case with further deliberation?

9. Court's Exhibit 3–A.

10. Trial Transcript Vol. IX, pp. 9–10.

FOREMAN: I guess we'll just have to ask them. I thought the consensus was no, but apparently it's changed.

COURT: Do you want to go up and continue deliberation?

FOREMAN: Please.

COURT: All right. Send the jury back upstairs.[11]

After deliberation for another one and a half hours, the jury returned with a verdict of guilty.

■ This Court has, in the past, found no error in the giving of *Allen* instructions after the jury has announced itself to be deadlocked after several hours of deliberation. *See Givens v. State*, 705 P.2d 1139, 1142–43 (Okl.Cr.1985); *Sartin v. State*, 637 P.2d 897, 898 (Okl.Cr.1981). This Court has also found that, "it is not improper for a trial judge, after a jury has been deliberating for some time, to call them into court to ascertain whether there is a reasonable probability of reaching a verdict so long as the judge exercises great caution to say nothing to coerce an agreement or to indicate his feelings in the case." *Shultz v. State*, 811 P.2d 1322, 1330–31 (Okl.Cr.1991). However, the question currently before this Court is whether the giving of the *Allen* instruction coupled with the repeated questioning of the jury and the foreman about whether further deliberations would be useful, constituted an unduly coercive process in this case. We find that taken in context, the inquiry made by the trial court to the foreman was not coercive, but instead, merely asked for clarification of the situation.

■ Appellant argues in his fifth proposition that the State's exhibits and the testimony concerning the results of forensic hair comparisons performed by forensic scientist Joyce Gilchrist should not have been admitted into evidence over defense counsel's objections. Prior to trial, defense counsel argued a motion in limine to preclude the introduction of hair evidence and to preclude forensic chemist, Joyce Gilchrist, from testifying at trial. This argument was overruled and Gilchrist testified at trial concerning the results of her analysis on hair found at the

scene of the homicide. Appellant alleges several errors related to the introduction of this evidence require reversal of this case.

Appellant first argues that the reliability of forensic hair comparison evidence has not been adequately established. He acknowledges that hair comparison evidence is routinely used in criminal trials and this Court has previously found such testimony to be admissible. *See Driskell v. State*, 659 P.2d 343, 355 (Okl.Cr.1983). However, he urges this Court to reconsider its position regarding the admissibility of hair analysis evidence, a request rejected by this Court in the past. *See Crawford v. State*, 840 P.2d 627, 636 (Okl.Cr.1992). Appellant has not persuaded this Court to now hold otherwise.

■ Next, Appellant argues that Gilchrist improperly implied that hair comparison analysis is a more exact science than it actually is and that hair comparison is a means of positive identification. This allegation is not supported by the record. Both on direct and cross examination Gilchrist acknowledged the limited value of hair comparison analysis. During direct examination, before testifying about her conclusions drawn from the hair comparison analysis, Gilchrist explained the nature of such analysis. She testified the conclusion can be drawn from hair comparison analysis that the hairs examined are consistent with hairs of a particular individual and therefore, could have come from that person. She also stated such analysis could positively eliminate a person as being the source of a hair. However, Gilchrist noted that hair comparison analysis could not serve as a basis for positive identification of a person. This was reestablished at the close of direct examination and several times during cross-examination, where Gilchrist again confirmed that a person cannot be positively identified by microscopic hair comparison. She agreed hair comparison evidence is subjective and its value is that it can exclude and eliminate persons, not that it can identify them. Finally, Gilchrist concluded her testimony on cross-examination by agreeing that she could not say that any hair found in this case came from Appellant.

11. Trial Transcript Vol. IX, p. 14.

■ Appellant directs this Court's attention to one portion of Gilchrist's testimony where she indicated that she could determine whether hairs found were associated with the events in this case. Appellant argues this conclusion was improper and served to mislead the jury. While this remark may have bordered upon impropriety, we cannot find it to have been so significant as to mislead the jury. Other statements made by Gilchrist in response to questions posed by defense counsel and the prosecutor clearly demonstrated the limited value of hair comparison evidence. This isolated remark did not constitute reversible error.

■ Finally, Appellant argues the State failed to establish a chain of custody adequate to show the relevancy of the hair comparison evidence. "The purpose of the chain of custody rule is to guard against substitution of or tampering with the evidence between the time it is found and the time it is analyzed." *Middaugh v. State,* 767 P.2d 432, 436 (Okl.Cr.1988). While it is the State's responsibility to show the evidence offered is in substantially the same condition at the time of offering as when the crime was committed, it is not necessary that all possibility of alteration be negated. *Williamson v. State,* 812 P.2d 384, 397–98 (Okl.Cr.1991), *cert. denied,* 503 U.S. 973, 112 S.Ct. 1592, 118 L.Ed.2d 308 (1992). If there is only speculation that tampering or alteration occurred, "it is proper to admit evidence and let what doubt there may be go to its weight rather than render the evidence completely inadmissible." *Contu v. State,* 533 P.2d 1000, 1003 (Okl.Cr.1975). *See also Williamson,* 812 P.2d at 398.

■ Appellant argues the State failed to lay the requisite foundation to establish a proper chain of custody. We disagree. The witnesses whose testimony established the chain of custody ranged from those who had collected the evidence and placed it in sealed bags, to those who transported the evidence to the laboratory, to those who tested and analyzed the evidence. This testimony adequately established the evidence was in substantially the same condition at the time it was offered as it was when collected.

■ Appellant's contention that Gilchrist's record keeping procedures were suspect because of the inconsistencies between her preliminary hearing testimony and her original forensic report does not render this evidence inadmissible. Doubts concerning the value of such evidence affect the weight of the evidence and not its admissibility. These inconsistencies were discussed during both direct and cross-examination where Gilchrist attempted to explain why her reports and her testimony varied. Accordingly, we do not find that the trial court erred in allowing Gilchrist to testify regarding the results of her hair comparison analysis.

■ Appellant's 1986 trial was reversed and remanded by this Court based in part upon prosecutorial misconduct. In his sixth assignment of error, Appellant argues that because the misconduct engaged in by the prosecutors in the first trial was so deliberate and egregious, the State should have been barred from retrying him by the principles of double jeopardy. Generally, double jeopardy rules do not serve as a bar to retrial after appellate reversal. *United States v. Ball,* 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300 (1896). However, Appellant acknowledges that the United States Supreme Court has held that double jeopardy bars retrial after a declaration of mistrial due to prosecutorial misconduct only in circumstances where the prosecutor actually intended to goad defense counsel into requesting a mistrial. *Oregon v. Kennedy,* 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982). *See also Divans v. California,* 434 U.S. 1303, 98 S.Ct. 1, 54 L.Ed.2d 14 (1977). Appellant urges this Court to extend this ruling to situations where prosecutors consciously choose to engage in prejudicial misconduct regardless of motive.

A similar issue was addressed by this Court in *Brewer v. State,* 718 P.2d 354 (Okl. Cr.), *cert. denied,* 479 U.S. 871, 107 S.Ct. 245, 93 L.Ed.2d 169 (1986). In *Brewer,* the defendant's first conviction was reversed primarily because of prosecutorial misconduct. After he was convicted in the second trial, the defendant asked this Court to apply the mistrial rule of *Kennedy* and *Divans* to his case and hold that retrial was barred by

double jeopardy. Without deciding whether the mistrial rule should ever be applied to cases which had been reversed on appeal, this Court held that relief was not warranted because the defendant had not shown that the prosecutor had committed the error in the first trial for the purpose of forcing the defendant to move for a mistrial. *Brewer*, 718 P.2d at 359. Accordingly, this Court has adhered to the standard set forth in *Kennedy* and *Divans* and we are not persuaded to deviate from that precedent at this time. Because Appellant in the present case has not demonstrated that the misconduct which contributed to the reversal of his first conviction was engaged in by the prosecutor for the purpose of goading defense counsel into moving for a mistrial, his second trial was not barred by the principles of double jeopardy.

 Appellant argues in his seventh proposition that he was prejudiced by the introduction of other crimes evidence at trial. He specifically complains that the State should not have been allowed to present evidence indicating that Willis had been raped and sodomized before she was killed.[12]

Appellant first argues this evidence was inadmissible because there was absolutely no proof these crimes occurred. Both the medical examiner and the forensic chemist testified at trial that they detected the presence of spermatozoa on vaginal swabs taken from Willis. There was conflicting evidence concerning the presence of spermatozoa on rectal swabs; the medical examiner did not detect spermatozoa on the rectal swabs but the forensic chemist did. Both experts agreed the sperm found on the rectal swab may have occurred as the result of drainage from the vaginal cavity. Further, the medical examiner detected no signs of trauma to either the victim's vagina or anus. Accordingly, while there was evidence of sexual activity, this was not conclusive evidence of rape or sodomy. However, the evidence of sexual activity taken together with the condition of the victim upon discovery, that she was naked on the floor with sheets and rope

around her neck, and evidence that a drop of seminal fluid was found on the floor next to her body, provides a basis from which sexual assault could be reasonably inferred. Accordingly, this argument fails.

 Appellant also contends that even if the evidence of sexual activity was a part of the *res gestae* of the homicide, such evidence should still have been excluded because its probative value was substantially outweighed by its prejudicial effect.[13] The party objecting to the admission of relevant evidence based upon section 2403 has the burden of proof. *Bear v. State*, 762 P.2d 950, 956 (Okl. Cr.1988). The evidence of sexual activity in the present case was admissible to demonstrate the circumstances surrounding the homicide which Appellant was accused of committing. There was evidence from which the jury could reasonably infer that a sexual assault had occurred. However, defense counsel was effective in eliciting from the experts testimony which indicated that the evidence of sexual activity did not absolutely support the conclusion that the victim had been sexually assaulted. Appellant has not proven that the evidence of sexual activity had unduly prejudicial effect. This evidence was not inappropriately admitted.

 It is Appellant's argument in his eighth assignment of error that the State's failure to sufficiently prove the unavailability of witness Jay Estep before introducing his testimony from the first trial violated Appellant's Sixth and Fourteenth Amendment rights to confrontation of the witnesses against him. During Appellant's first trial, the defense called Jay Estep, to corroborate Appellant's alibi that he had attended a party at the band studio with Terry Calvary the night Willis was killed. Estep, however, did not prove to be of much assistance to Appellant because he was confused as to the date of the band party. Estep was not sure whether this particular band party had occurred on December 6 or December 8, 1982.

12. Prior to the admission of this evidence, the State filed a Notice of Intent to Use Other Crimes, which put the defense on notice that such evidence would be introduced. *Burks v. State*, 594 P.2d 771 (Okl.Cr.1979), overruled on other grounds, *Jones v. State*, 772 P.2d 922 (Okl. Cr.1989).

13. *See* 12 O.S.1991, § 2403.

At his second trial, Appellant again presented as alibi, evidence that he and Terrie Calvary had been at the studio at a band party on December 9, 1982, the night Willis was killed. The State sought to rebut Appellant's alibi evidence with Estep's testimony indicating that the band party to which Appellant was referring, may have occurred on a night other than December 9, 1982. However, because the State claimed to have been unable to find Estep, it argued during an *in camera* hearing that he was unavailable. Accordingly, the trial court, over defense counsel's objection, allowed the State to introduce Estep's testimony through transcripts from Appellant's first trial.

This Court has long held that the State must satisfy two threshold requirements before prior testimony may be admitted into evidence. The prosecution must prove, "(1) [t]he actual unavailability of the witness despite good faith and due diligent efforts to secure the presence of the witness at trial; and, (2) the transcript of the witness' testimony bears a sufficient indicia of reliability to afford the trier of fact a satisfactory basis for evaluating the truth of the prior testimony." *Smith v. State,* 546 P.2d 267, 271 (Okl. Cr.1976).[14] Subject to these limitations, the admissibility of prior transcripts is within the discretion of the trial court, whose ruling will not be disturbed on appeal absent a showing of abuse of discretion. *Dilworth,* 611 P.2d at 259. It is Appellant's position that the trial court abused its discretion in allowing Estep's prior testimony to be admitted into evidence because the State did not make good faith, diligent efforts to secure Estep as a witness in this trial. Rather, Appellant contends, the State showed only that it had made minimal, last minute efforts to find Estep.

At the *in camera* hearing, Eddie Thomason, an investigator with the Oklahoma County District Attorney's Office testified he received the subpoena for Jay Estep on September 13, 1989, five days prior to trial. He went to the address listed on the subpoena and found Estep was no longer living there.

Thomason returned to his office and started checking utilities and various other sources in an attempt to locate Estep. He found no utilities listed in Estep's name. He also found the utilities in Estep's last known residence had been issued in the name of Susan Chalupa. Records indicated that she moved in 1986 and there was no record of her having transferred utility service to another location in the area. Thomason ran a Department of Public Safety check on Estep and got a date of birth and driver's license number. He testified that between August 1978 and May 1986, Estep had a lengthy and consistent driving record. The driving record reflected no further activity after May 29, 1986. Based upon this information and the fact that Estep's Social Security number had been issued out of state, Thomason determined it likely that Estep had moved from the area. Accordingly, he marked on the subpoena that he was unable to locate Estep.

The evidence that Thomason did not receive the subpoena and start searching for Estep until five days before trial lends credence to Appellant's assertion that the attempt to find Estep was initiated at the eleventh hour. However, this alone does not foreclose a finding that the State's attempt to secure Estep was diligent and conducted in good faith. The leads which were followed by Thomason did support his conclusion that Estep was no longer in the area. There is no indication that had Thomason been able to start his search earlier, he would have arrived at different results. Accordingly, this Court does not find the trial court abused its discretion in allowing Estep's testimony from the prior proceeding to be read into evidence.

 Even if this Court were to find that the trial court abused its discretion in allowing this testimony into evidence reversal would not be warranted. This Court has held that where the testimony improperly admitted was cumulative in nature, reversal is not required. *Castro v. State,* 745 P.2d 394, 401 (Okl.Cr.1987), *cert. denied,* 485 U.S.

---

14. *See also Dilworth v. State,* 611 P.2d 256 (Okl. Cr.1980); *Davis v. State,* 753 P.2d 388 (Okl.Cr. 1988). Further, the rule adhered to in these cases conforms with the United States Supreme

Court's holding in *Ohio v. Roberts,* 448 U.S. 56, 74-75, 100 S.Ct. 2531, 2543, 65 L.Ed.2d 597 (1980).

971, 108 S.Ct. 1248, 99 L.Ed.2d 446 (1988). Appellant argues Estep's confusion about the date of the band party was material to the State's case and not cumulative. However, the record reflects otherwise. While Appellant and Terrie Calvary testified the band party at issue occurred on the night Willis was killed, Estep was not the only person whose testimony did not corroborate this. Shawn McCarthy testified that Appellant was not at the studio at band practice on the night Willis was killed. Accordingly, it may be found that Estep's testimony was cumulative to McCarthy's and therefore, even if improperly admitted, not grounds for reversal.

▮▮▮▮ Appellant argues in his ninth proposition that the trial court erred in allowing three gruesome photographs of the victim to be admitted into evidence. Photographs are admissible when their content is relevant and their probative value substantially outweighs their prejudicial effect. *Williamson v. State*, 812 P.2d at 400 (Okl.Cr. 1991). "The probative value of photographs of murder victims can be manifested numerous ways, including showing the nature, extent, and location of wounds, depicting the crime scene, and corroborating the medical examiner's testimony." *Id.* The photographs of the victim admitted into evidence in the present case were not unduly gruesome. Further, they were relevant as they corroborated the testimony of the medical examiner as to the knife wounds suffered by the victim. The admission into evidence of these photographs was not error.

### SECOND STAGE ISSUES

▮▮▮▮ Appellant's twelfth proposition concerns the trial court's refusal to instruct the jury on Appellant's requested alternative sentencing option of life imprisonment without parole. In 1987, the Oklahoma Legislature amended 21 O.S.Supp.1987, §§ 701.9 and 701.10 to include life without parole as one of three possible punishments for a conviction for First Degree Murder. The life without parole provision became effective on November 1, 1987. The trial which is the

subject of this appeal was held in September and October of 1989. Defense counsel requested the jury be instructed that they could sentence Appellant to life without parole, but this request was denied by the trial court.[15] This ruling was in error.

This Court has recently held that to bar a defendant from the benefit of having a jury consider the option of life without parole when this sentencing provision was in effect at the time of the trial and conviction violates due process and equal protection. *Salazar v. State*, 852 P.2d 729 (Okl.Cr.1993), *reh'g denied*, 859 P.2d 517 (Okl.Cr.1993). Accordingly, this omission requires the case be remanded to the district court for resentencing as the sentencing stage of trial was fundamentally unfair. *Id.* See also *Hain v. State*, 852 P.2d 744 (Okl.Cr.1993), *cert. denied*, — U.S. —, 114 S.Ct. 1402, 128 L.Ed.2d 75 (1994): *Humphrey v. State*, 864 P.2d 343 (Okl.Cr.1993), *cert. denied*, — U.S. —, 114 S.Ct. 1663, 128 L.Ed.2d 379 (1994). Because this remand for resentencing renders moot all other challenges to the second stage proceedings, other propositions raising errors alleged to have occurred in the sentencing stage of trial need not be discussed.

In summary, we **AFFIRM** Appellant's conviction for First Degree Murder and **REVERSE** the sentence of death, **REMANDING** the case to the District Court for **RESENTENCING.**

JOHNSON, P.J., CHAPEL, V.P.J., and LANE, J., concur.

LUMPKIN, J., concur in part/dissent in part.

LUMPKIN, Judge, concurring in part/dissenting in part.

While I concur in the affirmance of the conviction for Murder, First Degree, I differ with the majority's analysis of Appellant's proposition regarding the sufficiency of the evidence presented against him and disagree with the assumption expressed in Footnote 5 regarding a pretextual arrest, together with the additional unsupported assumption the arrest was illegal. An officer cannot disre-

15. Trial Transcript Vol. XI, p. 224–26.

gard warrants for the arrest of an individual just because that individual is a suspect in another crime. I must also dissent to the Court's decision to reverse and remand for resentencing.

The Court examines Appellant's insufficiency of the evidence claims using the standard of review requiring the evidence to exclude every reasonable hypothesis except that of guilt. The Court mistakenly states that the evidence presented at trial was entirely circumstantial. This is not the case. Appellant's own testimony at trial, together with his statement to Cindy Parks and others, constituted direct evidence, allowing use of the *Spuehler v. State,* 709 P.2d 202 (Okl. Cr.1985) standard of review. *Mayes v. State,* 887 P.2d 1288, 1302 (Okl.Cr.1994). As stated in my special concurrence to *White v. State,* 900 P.2d 982, 995 (Okl.Cr.1995), I urge the Court to adopt a "unified *Spuehler*-type" approach recognizing the equivalent reliability of direct and circumstantial evidence when analyzing sufficiency claims.

I dissent to the Court's decision to reverse Appellant's death sentence for resentencing because of the trial court's failure to give an instruction on the punishment option of life without possibility of parole. I reiterate the analysis and conclusions in my separate opinions in *Hain v. State,* 852 P.2d 744, 753 (Okl.Cr.1993), cert. denied, —— U.S. ——, 114 S.Ct. 1402, 128 L.Ed.2d 75 (Okl.Cr.1994) and *Salazar v. State,* 852 P.2d 729, 741 (Okl. Cr.1993) that the proper criminal penalty is the penalty in effect at the time the defendant commits the crime. Consequently, Appellant was not entitled to an instruction on life without possibility of parole.