Larry Floyd **BARNETT**, Appellant,

v.

**STATE of Oklahoma, Appellee.**

No. F-86-895.

Court of Criminal Appeals of Oklahoma.

May 18, 1993.

Bill J. English (Trial Counsel), E. Joe Lankford (Appellate Counsel), Norman, for appellant.

R. Richard Sitzman, Tim D. Kuykendall (Trial Counsel), Norman, Robert H. Henry, Atty. Gen., Wellon B. Poe, Asst. Atty. Gen. (Appellate Counsel), Oklahoma City, for appellee.

**OPINION**

PER CURIAM:

Appellant, Larry Floyd Barnett, was tried by a jury for the crimes of Murder in the First Degree, in violation of 21 O.S.Supp.1985, § 701.7, or in the alternative, Accessory to First Degree Murder, in violation of 21 O.S.1981, § 173, in Case No. CRF–86–480, and Arson in the Third Degree, in violation of 21 O.S.1981, § 1403(A), in Case No. CRF–86–479, in the District Court of Cleveland County. The jury found the appellant guilty of First Degree Murder and Third Degree Arson, and assessed punishment at death and fifteen (15) years imprisonment, respectively. The trial court sentenced the appellant accordingly. From this Judgment and Sentence, appellant has perfected his appeal to this Court.

On the evening of Friday, April 11, 1986, Tom Sloan and his fiancee, Lisa Enboden, went to the 3300 Club in Oklahoma City. There, they saw appellant, whom they had met at the club the previous week. After the bar closed, Sloan and Enboden agreed

to take the appellant home because John Shaw, the person who was supposed to give him a ride, had not yet arrived. However, when they walked to the parking lot John Shaw was there. Regardless, appellant rode with Sloan and Enboden to the house in Noble where appellant was staying. On the way to Noble, Sloan's right rear tire went flat but Sloan continued to drive on the rim until they arrived at the house. When they arrived at the house around 3:00 a.m., Shaw was there.

Sometime after they arrived, Enboden decided that she wanted to stay with the appellant and she wanted Sloan to leave. At her request, appellant asked Sloan to leave and when Sloan hesitated, appellant pushed him out of the house. A few minutes later, Sloan kicked in the door to try to talk to Enboden. At that point, appellant and Sloan went outside. Shortly thereafter Shaw went outside as well. Enboden walked out to the front yard and saw the three men mostly pushing and shoving each other but she also saw a couple of swings. After five minutes she went back inside the house.

Several minutes later, appellant came in the house and asked Enboden for Sloan's car keys. Enboden did not know where they were and appellant went back outside. A short time later, Shaw entered the house and went to the kitchen. He left the house carrying something that looked like a knife. Enboden watched through the front window as a "shadow" ran across the lawn, kneeled over a figure on the lawn and made several stabbing motions. She testified that this "shadow" was John Shaw. Enboden did not see appellant during this time. Shaw returned to the house with blood on him. When appellant came back in the house he and Enboden went to bed.

The following morning, appellant and Shaw went outside to change the tire on Sloan's car. When they were unsuccessful, appellant decided to borrow a welding truck from his boss so that he could cut the lug nuts off the wheel and change the tire. While appellant was gone to get the truck, Shaw and Enboden went to a convenience store where Enboden bought a soft drink and Shaw bought a cup of coffee and some gas which he put in containers. When they returned to the house, Shaw got in Sloan's car and was backing it into the driveway when Sloan sat up in the back seat of the car. Shaw went inside the house and came back outside with a knife. Shaw then stabbed Sloan several times and attempted to suffocate him with plastic. When Shaw returned to the house he had blood on his arms and shirt.

After fixing Sloan's car, the two men left with Shaw driving Sloan's car, a green Malibu, and appellant driving Shaw's car, a black Ford Grenada. At approximately noon, Phillip Noland observed a green Malibu with a damaged right wheel traveling east on Etowah road in Cleveland County, followed by a dark colored Grenada. Noland noticed the cars because he heard a loud noise like a tire screeching. He watched as the damaged tire on the Malibu blew, and the car swerved into a ditch. The Grenada parked nearby. Noland saw a man look in the open trunk of the Malibu. Noland had stopped watching and walked to the other side of his house when he heard a muffled explosion. He turned and saw the Grenada speeding away. When he walked to the other side of his house again, he could see the entire interior of the Malibu burning. In a taped statement, appellant claimed that Shaw set fire to the car, but admitted that he knew Shaw was going to burn the car.

The body of Sloan was found in the back seat and the fire was determined to have started as a result of arson. However, at trial the medical examiner testified that the cause of Sloan's death was a combination of multiple stab wounds and blunt force head injuries. In addition, she stated that a pencil found jammed in Sloan's ear could have been a contributing factor in his death. Despite her positive findings concerning the cause of death, the medical examiner could not exclude the possibility that the deceased had been alive at the time of the fire. However, she stated that to address the speed at which death occurred or to find that the death was heat related would be "speculation."

The day after Sloan's car was burned, Shaw and appellant, driving Shaw's car, took Enboden to the trailer where she had lived with Sloan so that she could retrieve some of her belongings. When they arrived, the trailer was locked and she was not able to go inside. However, while they were there, Sloan's younger brother noticed them and got a description and the license number of their car. The police were notified of this incident and were given the car description and the license number. Later, the police spotted Shaw's car driving on Highway 77 and stopped it for investigatory purposes. Appellant, Shaw and Enboden were in the car and were arrested.[1]

### Issues Relating to Guilt/Innocence

While appellant was in custody under arrest, he made a statement to the police which was taped and later admitted into evidence at trial. He claims that this statement should have been suppressed because it originated as the result of an illegal arrest. Appellant specifically claims that the police did not have probable cause to arrest him when they did so. We disagree.

Title 22 O.S.1981, § 196 provides that "[a] peace officer may, without a warrant, arrest a person ... [w]hen a felony has in fact been committed, and he has reasonable cause for believing the person arrested to have committed it." In determining what constitutes sufficient probable cause for a warrantless arrest, this Court has found that "[t]he test for a lawful warrantless arrest is whether at the moment the arrest was made the facts and circumstances within the arresting officer's knowledge, and of which he has reasonably trustworthy information, were sufficient to warrant a prudent man to believe that the arrestee had committed or was committing a crime." *Pitts v. State,* 649 P.2d 788, 790 (Okl.Cr. 1982), citing *Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964).

At the preliminary hearing, the arresting officers testified that during the course of their investigation into the homicide and arson, the vehicle in which the appellant, Shaw and Enboden were riding, Shaw's car, was stopped initially because it matched the description of the vehicle which had been seen at the scene of the arson, at the house in Noble along with Sloan's car, and most recently at Sloan's house. Prior to the stop and arrest the police had been told the license tag number of the car seen at Sloan's house earlier that day. This was the tag number on Shaw's car. They also discovered that Enboden, a material witness, was present in the car. They noted that appellant and Shaw fit the physical descriptions of the two men sighted at the scene of the arson where Sloan's body was found. Based upon this information, we find that the police did have probable cause to believe that a crime had been committed and that the appellant had committed it. Thus, the warrantless arrest of appellant was valid.

Shortly after his arrest, appellant made a statement which was video taped and subsequently admitted into evidence against him at trial. Appellant argues that this statement should have been suppressed as it was the result of police trickery and was not the result of a knowing, intelligent and voluntary waiver of his right to remain silent. Appellant claims that the police trickery which coerced him into making the incriminating remarks occurred when the police told him that his version of the story differed from those given by Shaw and Enboden when in fact the police had not yet talked to Shaw or Enboden. The record reflects that while the police had spoken with Shaw, they had not received a statement from Enboden at that time.

In determining whether a statement was made voluntarily, one must look to the totality of the surrounding circumstances, including the characteristics of the accused and the details of the interroga-

---

**1.** John Shaw was tried in Case No. CRF–86–478 and was convicted of First Degree Murder and Third Degree Arson. He was sentenced to life in prison and fifteen (15) years imprisonment, respectively.

Lisa Enboden had not been charged with any crime at the time of appellant's trial. In exchange for her testimony she was granted partial immunity as to the crimes of accessory to murder and arson.

tion. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Where the voluntariness of a statement is in question it is proper procedure for the trial judge to hold an in camera hearing to determine whether the statement was made voluntarily. *See Jackson v. Denno*, 378 U.S. 368, 382, 84 S.Ct. 1774, 1783, 12 L.Ed.2d 908 (1964). Where there has been such a hearing, this Court will not disturb the ruling where the trial court's decision to admit a statement is supported by sufficient evidence that the statement was made voluntarily. *See Elliott v. State*, 753 P.2d 920, 922 (Okl.Cr.1988).

█ In the present case, the trial judge did hold an in camera hearing in order to make a determination on the voluntariness of appellant's statement. At the hearing, the appellant claimed that the police informed him that both Shaw and Enboden had told them that appellant killed Sloan. He claims that if they had not told him this, he would not have made any statements. However, on cross examination, appellant revealed that he was advised of and understood his *Miranda* warnings. He indicated that he understood that he did not have to talk to the police if he did not want to do so, and that it was his desire to tell his side of the story that afternoon. He also acknowledged that he gave his statement voluntarily. In light of this testimony and the circumstances surrounding the interrogation, we cannot find that the trial judge erred in finding that the appellant made his statement knowingly and voluntarily.

Having determined that appellant's arrest was lawful and that his statement was properly admitted into evidence, we can now address his first proposition of error wherein he claims that the evidence was insufficient to sustain his conviction for First Degree Murder. Specifically, he claims that the State failed to prove that he was a principal to the crime of First Degree Murder as the evidence merely proved that he acquiesced to the crime which was committed by John Shaw. Because the evidence presented at trial was both direct and circumstantial, the test for determining the sufficiency of the evidence is whether,

after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt. *Greer v. State*, 763 P.2d 106, 107 (Okl.Cr.1988).

█ In order for an accused to be convicted as a principal in a crime, it must be established that he directly committed each element of the offense, or that he aided and abetted another in its commission. 21 O.S. 1981, § 172. "Aiding and abetting in the crime requires the State to show the accused procured it to be done, or aids, assists, abets, advises or encourages the commission of the crime." *Hindman v. State*, 647 P.2d 456, 458 (Okl.Cr.1982). While mere presence or acquiescence, without participation, does not constitute a crime, only slight participation is needed to change a person's status from mere spectator into an aider and abettor. *See Id; McBrain v. State*, 763 P.2d 121, 124–125 (Okl.Cr.1988).

█ In the present case, the forensic pathologist testified that in her opinion, based upon medical fact, the cause of Sloan's death was a combination of stab wounds to the chest and blunt force head injuries. When asked whether the fire could have been a contributing factor in Sloan's death, the forensic pathologist testified that she could not exclude that possibility. She said that there was no anatomical or chemical evidence that Sloan was alive when he was burned. However, she also said that such evidence would not necessarily be present if the fire that burned him was of an explosive type. Thus, based upon the medical facts, she indicated that it would be speculation for her to say for sure when Sloan died and whether or not the fire was a contributing factor in his death.

Appellant argues that this testimony necessarily excludes the jury from finding that the fire contributed to the decedent's death. He contends that such a finding would be based upon mere speculation as there was no evidence that Sloan was alive at the time of the fire. In fact, he claims that the State's own evidence proved that the victim was dead prior to the fire. We disagree.

The testimony of the forensic pathologist was not the only evidence that the jury had before it to determine whether or not Sloan was alive at the time of the fire and whether the fire contributed to his death. During the video taped interview, appellant stated more than once that he thought Sloan was still alive when they drove him out to the country. He also stated that he didn't want to drive Sloan's car because he was afraid that Sloan might raise up on him during the drive. The statement of Mr. Noland, that he heard an explosion before he noticed the car burning, is also relevant when considered in light of the forensic pathologist's statement that an explosive fire could have contributed to the decedent's death without leaving anatomical or chemical evidence.

Thus, we find there to have been additional evidence from which the jury could have found that Sloan was still alive at the time of the fire and that the fire contributed to his death. Further, there was evidence that appellant knew that Shaw had put gas in a container in the trunk of the car and that they were going to set fire to the car with Sloan in it. He gave Shaw the screwdriver necessary to open the trunk in order for Shaw to remove the container of gas that was used to ignite the car and Sloan. We find that this evidence, when viewed in the light most favorable to the State, is sufficient to support the jury's finding, beyond a reasonable doubt, that the appellant aided and abetted in the commission of First Degree Murder. Accordingly, this assignment of error is denied.

Clearly, appellant's video taped statement was instrumental in securing the conviction against him. The appellant acknowledges this and alleges that the video taped statement was obscure, confusing and disjointed. He claims that because of this, his statement was subject to being misinterpreted to indicate that Sloan was still alive at the time of the fire. Thus, appellant contends that he was denied effective assistance of counsel because his attorney did not put on a defense by putting him on the witness stand to rehabilitate the prior inculpatory statement.

The standard of review for ineffective assistance of counsel is two pronged: First, an appellant must show that counsel's performance was deficient; second, an appellant must show that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). There is a strong presumption that counsel's performance falls within the wide range of reasonable professional conduct. *Id.* 466 U.S. at 689, 104 S.Ct. at 2065. We also note that this Court has repeatedly held that representation will not be deemed inadequate because in hindsight trial strategy could have been different. *See Stover v. State*, 674 P.2d 566, 568 (Okl.Cr.1984); *Smith v. State*, 650 P.2d 904, 908 (Okl.Cr.1982).

In the present case, appellant claims that he was denied effective assistance of counsel because his defense attorney did not put him on the witness stand to controvert the State's speculation that he had inferred in the video taped statement that Sloan was still alive at the time of the fire. In the taped statement appellant said that he did not want to drive Sloan's car with Sloan in the back seat because he was afraid that Sloan would raise up on him. Appellant argues that had he taken the stand, this statement could have been explained as his fear of being alone with a dead body.

It is not clear from the record that defense counsel did not consider this as a possible avenue of defense and make a tactical decision not to utilize it. In fact, defense counsel could well have considered it and thought it best to refrain from proffering a weak defense so as not to subject his client to a potentially devastating cross examination by the State. Because this appears to have been a reasonable tactical decision, we cannot find that appellant has shown defense counsel's performance to have been deficient. Further, appellant has not convinced this Court that this line of defense could reasonably have changed the outcome of the trial. This assignment is denied.

■ Appellant contends that the trial court erred by not excluding the testimony of Bobby Sloan, the victim's father, because the testimony of this witness was offered to raise sympathy in the minds of the jurors. We disagree. The record reveals that Mr. Sloan's testimony was short and limited to establishing that Lisa Enboden and Tom Sloan had lived together and that Tom Sloan owned a green Malibu. We do not find that the trial court abused its discretion in determining that his line of questioning was relevant to issues presented at trial. Nor do we find that this testimony was intended to, or actually did, raise sympathy and prejudice the jury against the appellant.

■ As to his conviction for Arson in the Third Degree, appellant contends that reversal is required because the State failed to prove that the vehicle burned was worth at least fifty (50) dollars, as is required by 21 O.S.1981, § 1403. It is true that the State has the burden of proving every element of the crime charged. *Drew v. State,* 771 P.2d 224, 231 (Okl.Cr.1989). However, elements can be proved by circumstantial evidence. *Dodson v. State,* 674 P.2d 57, 58 (Okl.Cr.1984). Further, this Court will accept all reasonable inferences and credibility choices that tend to support the jury's verdict. *Williams v. State,* 721 P.2d 1318, 1320 (Okl.Cr.1986).

■ At trial, Jay Stewart testified that he had sold the Malibu to Tom Sloan on March 22, 1986, approximately three weeks prior to the time that the car was burned. The evidence indicated that the car was sold to Sloan for one hundred and fifty (150) dollars. Although Mr. Stewart acknowledged that the car could have depreciated in value from the time it was purchased, he stated that the engine itself, if it was a good engine, would probably bring one hundred (100) to one hundred fifty (150) dollars. He did not know if this car had a good engine. Further, Bobby Sloan testified that the car was in running condition. We find that this testimony, while not direct evidence of the value of the vehicle, supports a reasonable inference that the value of the burned Malibu was at least fifty (50) dollars.

■ Appellant also argues that the sentence assessed on the arson conviction, fifteen (15) years imprisonment, was excessive under the circumstances. We note that this sentence was within the statutory limits. When a sentence imposed is within the statutory limits, this Court will not modify unless under the facts, the sentence is found to be so excessive as to shock the conscience of the Court. *Bristol v. State,* 764 P.2d 887 (Okl.Cr.1988). In this case, we make no such finding.

### Issues Relating to Sentencing

■ The jury imposed the death penalty upon the appellant after finding that two aggravating circumstances existed; that "the murder was especially heinous, atrocious, or cruel," and that "the murder was committed for purposes of avoiding or preventing a lawful arrest or prosecution." Appellant urges this Court to find that the second aggravating circumstance, that "the murder was committed for the purpose of avoiding or preventing lawful arrest or prosecution," is not supported by the evidence.

This aggravating circumstance, by definition, requires that there be a predicate crime, separate from the murder, for which the appellant seeks to avoid arrest or prosecution. In prior cases in which this Court has upheld the validity of this aggravating circumstance, the predicate crime has clearly been a separate and distinct offense from the murder.[2] In the present case, however, the appellant was alleged to have committed the crime of murder for the

---

2. *See Berget v. State,* 824 P.2d 364 (Okl.Cr.1991) (jury found that victim was murdered to prevent defendant's arrest for kidnapping); *Williamson v. State,* 812 P.2d 384 (Okl.Cr.1991) (defendant was found to have murdered victim to avoid arrest for rape); *Fox v. State,* 779 P.2d 562 (Okl.Cr.1989) (defendant sought to avoid prosecution for robbery by murdering the victim); *Munson v. State,* 758 P.2d 324 (Okl.Cr.1988) (defendant committed a robbery and a kidnapping and subsequently murdered the victim to avoid prosecution for those predicate crimes).

purpose of avoiding lawful arrest or prosecution for the predicate crime of assault and battery. Under the circumstances of this case, we find such allegation untenable because the evidence shows that the protracted assault and battery was the ultimate cause of the victim's death. The assault and battery was not separate and distinct from the murder itself, but rather was part of a continuing transaction which culminated in the death of the victim. Because the aggravated assault and battery, at a minimum, was a significant contributing cause of the victim's death, the appellant can not be found to have murdered the victim in order to avoid prosecution for the assault and battery. As the appellant points out in his brief, almost every murder is preceded by an assault and battery or the crime of felonious pointing of a firearm. Where such crimes are not separate and distinct from the murder itself, but rather significantly contribute to the death, they may not be used as the predicate crime for purposes of this aggravating circumstance. To hold otherwise would undermine the clear purpose of this aggravating circumstance. Accordingly, we find that the assault and battery, which in this particular case was part of the continuing transaction which resulted in the death of Sloan, was not a separate and distinct crime from the murder itself. Accordingly, we must hold that this aggravating circumstance, that "the murder was committed for purposes of avoiding or preventing a lawful arrest or prosecution," fails.

 When an aggravating circumstance is found to be invalid, this Court has the authority to review any remaining aggravating circumstances and the mitigating evidence to determine the validity of the death sentence. *Castro v. State*, 745 P.2d 394 (Okl.Cr.1987), 749 P.2d 1146 (Okl.Cr. 1987) (Opinion on Rehearing), cert. denied, 485 U.S. 971, 108 S.Ct. 1248, 99 L.Ed.2d 446 (1988); 21 O.S.Supp.1986, §§ 701.13(C) and 701.13(F). A specific reweighing of the aggravating circumstances versus the mitigating factors is implicit to this review.

*Stafford v. State*, 815 P.2d 685 (Okl.Cr. 1991); *Clemons v. Mississippi*, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990).

 In the present case, the only remaining aggravating circumstance is that "the murder was especially heinous, atrocious, or cruel." While the facts of this case certainly support a finding that the murder was especially heinous, atrocious or cruel, they also indicate that the vast majority of the acts upon which this aggravating circumstance can be based, were perpetrated against the victim by John Shaw. Many occurred in the absence of the appellant. Conversely, the mitigating evidence showed, among other things, that appellant had been a dependable, hard working employee with a reputation for honesty. He had incurred no problems with his fellow employees and had displayed no violent conduct. Further, he had served two tours of duty in Vietnam and had received a purple heart, bronze medal and army commendation medal. Because the evidence shows that the appellant's actual, physical participation in the most brutal acts was minimal, we find that the mitigating evidence outweighs this remaining aggravating circumstance. Accordingly, appellant's death sentence must be modified to life imprisonment.[3]

Having reviewed the allegations of error raised by appellant, we find that the convictions for First Degree Murder and Third Degree Arson shall be **AFFIRMED**. The sentence returned for the Arson conviction is **AFFIRMED** but the death sentence returned for the Murder conviction is **MODIFIED TO LIFE IMPRISONMENT.**

LUMPKIN, P.J., and LANE and CHAPEL, JJ., concur.

JOHNSON, V.P.J., specially concurs.

JOHNSON, Vice Presiding Judge, specially concurring:

While I specially concur with the decision of the Court herein I feel there are items

---

**3.** We note that this result is in accordance with the recommendation of the trial judge, who stated on the record his suggestion that, under

the circumstances of this case, this Court modify the appellant's sentence from death, to life imprisonment.

that must be pointed out relative to my concurrence. The Court has noted by footnote that the trial judge who tried this case, The Hon. Preston Trimble, made the note in his trial notes that the case should be modified from the sentence of death to life imprisonment. This is an exceedingly unpopular type of statement by a trial judge.

If there is anyone who is in a position to oversee and/or monitor the evidence that comes into a case, it is the trial judge. He has the expertise to look at the evidence from a dispassionate point of view. I believe the trial judge that has the courage to make this sort of recommendation to this Court should be followed. Therefore, I acquiesce to the position of the trial judge and would also vote to affirm the conviction but modify the sentence to life imprisonment.