Lloyd Edward MOLLETT, Appellant,

v.

STATE of Oklahoma, Appellee.

No. F–95–214.

Court of Criminal Appeals of Oklahoma.

April 30, 1997.

Rehearing Denied June 23, 1997.

Debbie Mattox, Oklahoma Indigent Defense, Robert G. Perrine, Norman, for Defendant at trial.

Beth Pauchnik, Laura Austin Thomas, Assistant District Attorneys, Stillwater, for the State at trial.

W.A. Drew Edmondson, Attorney General, William L. Humes, Assistant Attorney General, Oklahoma City, for Appellee on appeal.

Cindy G. Brown, James A. Drummond, Appellate Defense Counsel, Norman, for Appellant on appeal.

### OPINION

JOHNSON, Judge:

Lloyd Edward Mollett was tried by a jury in the District Court of Payne County, Case No. CRF–93–491 before the Honorable Donald L. Worthington. Appellant was convicted of First Degree Malice Aforethought Murder (Count I) and Rape in the First Degree (Count II). After finding the existence of two aggravating circumstances—the murder was "especially heinous, atrocious or cruel"; and the murder was committed to avoid lawful arrest or prosecution—the jury set punishment at death for the murder and seventy-five (75) years imprisonment for the rape. The trial court sentenced Appellant accordingly. Appellant now appeals.

This case arises out of the rape and murder of Sri Sedjati Sugeng. Sri Sugeng and Appellant both lived at the Forty North Apartments during the summer and fall of 1993. During this time, the two became somewhat acquainted as they both owned Rottweiler dogs and would sometimes talk to each other as they walked the dogs. Ms. Sugeng was from Indonesia and had moved to Stillwater in order to attend Oklahoma State University.

On the evening of October 22, 1993, Sugeng and two of her friends, Latina Harjono and Erfin Soesanto, met at a local restaurant at approximately 6:00 p.m. After eating dinner, the trio went to the Carmike Cinema to see a movie. Finding that they had missed the start of the movie, they made plans to see a later show. Sugeng drove Harjono and Soesanto home at approximately 8:00 p.m. At approximately 9:50 p.m., Harjono and Soesanto went to Sugeng's apartment after repeated attempts to reach Sugeng by telephone were unsuccessful.

Upon arriving at Sugeng's apartment Harjono and Soesanto received no response to their knocks. The pair heard the television and entered the apartment calling for Sugeng. After quickly taking Sugeng's dog for a walk, the pair returned to the apartment. Harjono went into Sugeng's bathroom and found Sugeng face down in the bathtub. A call to 911 was made while Soesanto administered CPR. Sugeng was wearing only a jacket when she was found. Attempts to resuscitate Sugeng by Soesanto and ambulance personnel were unsuccessful.

A subsequent investigation of the victim's apartment revealed, among other things, two blood stains on the living room floor. Near those blood stains was a baseball cap in which hairs were subsequently found. A pair of torn pink panties were found near the victim's bed. Bloodstains were also found near Sugeng's bed and on the bed, near the corner.

The baseball cap found in the victim's apartment was later traced to Appellant, who admitted the cap was his. The bloodstains in the living room were identified as the blood of the victim. The stain on the bed con-

tained both the blood of the victim and Appellant's semen. Appellant's semen was also detected on the vaginal swabs later taken by the medical examiner.

Dr. Larry Balding, a deputy medical examiner, examined the victim's body and found contusions and bruises on her cheek, under her chin and inner lips. Dr. Balding also noted a contusion on the victim's chest and bruising on her hips. Both these injuries were consistent with weight bearing down on those areas of the body. A laceration just outside the victim's vagina and a laceration inside the vagina in the area of the hymen were also discovered. Dr. Balding testified that the injuries to the vaginal area were consistent with blunt force trauma.

Injuries consistent with defensive wounds were found on the victim's hands, wrists and forearms. In addition, marks on the victim's throat, in conjunction with petechial hemorrhaging, indicated the victim had been strangled. Lastly, the victim was found face down in her bathtub and her lungs and trachea were filled with fluid in a manner associated with drowning. The medical examiner ultimately concluded the cause of death to be asphyxia from either drowning or neck compression.

Other relevant facts will be discussed in the propositions of error to which they relate.

### ISSUES RELATING TO GUILT/INNOCENCE

Appellant contends in his first assignment of error that error resulted from the issuance and execution of search and arrest warrants. On October 28, 1993, Special Judge Lois Belden signed an arrest warrant for Appellant's arrest and search warrants to search Appellant's apartment and to obtain body samples.[1] Appellant maintains the warrants were not supported by a sufficient showing of probable cause. Appellant further contends he was denied effective assistance of counsel by defense counsel's failure to file a motion

to suppress the arrest, the searches and the evidence derived therefrom.

"The purpose of a warrant is to allow a neutral judicial officer to assess whether the police have probable cause to make an arrest or conduct a search." *Steagald v. U.S.*, 451 U.S. 204, 212, 101 S.Ct. 1642, 1648, 68 L.Ed.2d 38 (1981). Although an arrest warrant and a search warrant both involve a probable cause determination, the interest of the two warrants differ. *Steagald*, 451 U.S. at 212-13, 101 S.Ct. at 1648. An arrest warrant may be issued upon a showing that probable cause exists to believe that the subject of the warrant has committed an offense. *Id.* at 213, 101 S.Ct. at 1648. Thus, the warrant serves to protect an individual from an unreasonable seizure. *Id.* On the other hand, a search warrant may be issued upon a showing of probable cause to believe that a legitimate object of a search is located in a particular place. *Id.* This determination safeguards an individual's interest in the privacy of his home and possessions against an unjustified intrusion by law enforcement. *Id.*

In the instant case, the affidavits for both the arrest and search warrants utilized the same facts to demonstrate probable cause existed. The information provided included the following: (1) that Appellant admitted the hat found inside the victim's apartment was his; (2) that Appellant gave two different versions of why the hat was in the apartment; (3) that Appellant stated he had never been past the front door entry way of the victim's apartment; and (4) that OSBI criminalist Mary Long determined that hair found on the hat and on a wet towel lying near the victim's body was consistent with known samples voluntarily given to authorities by Appellant.

Appellant contends that one hair matching his found on a towel near the body was not sufficient to support the magistrate's probable cause determination.[2] Appellant is underestimating the significance of the information provided in the affidavits. Appellant's

---

1. Blood, hair and saliva samples.

2. This claim is based on Mel Hett's testimony at trial. Mr. Hett's testimony was not available to the magistrate at the time the warrants were

issued. Our review is limited to the information presented to the magistrate at the time the warrants were obtained.

hair was found near the victim's body. This hair is physical evidence linking Appellant to the room in which the victim's body was found. Moreover, the presence of Appellant's hair in the victim's bathroom is inconsistent with Appellant's claim that he had never been beyond the victim's front door. Appellant also gave the interviewing officer two different explanations for how his hat was found inside the victim's apartment. While one of these factors alone may or may not support a finding of probable cause, when combined, the probability that Appellant committed the crime and that a search of his apartment may uncover further evidence of his wrongdoing becomes substantial.

 The question is not whether the information contained in the affidavits was sufficient to convict Appellant in a court of law, but whether probable cause existed for the issuance of the warrants. "The existence of probable cause is a common sense standard requiring facts sufficient to warrant a man of reasonable caution in the belief that an offense has or is being committed." *United States v. Wicks*, 995 F.2d 964, 972 (10th Cir.1993). A magistrate's finding of probable cause is to be given great deference. *Gregg v. State*, 844 P.2d 867, 874 (Okl.Cr.1992).

 Upon review, we find the information set forth in the affidavits was sufficient to support the magistrate's findings of probable cause for both the arrest and search warrants. With regard to the arrest warrant, the above described information was sufficient to establish probable cause that a crime had been committed and that Appellant was involved in the crime. *See Shadwick v. City of Tampa*, 407 U.S. 345, 350, 92 S.Ct. 2119, 2122, 32 L.Ed.2d 783, 788 (1972). With regard to the search warrants, we find the magistrate had a substantial basis for concluding that probable cause existed. *Lynch v. State*, 909 P.2d 800, 805 (Okl.Cr. 1995). The residence of a person arrested for committing a crime is the natural place for concealing evidence of that crime. *Bol-*

*linger v. State*, 556 P.2d 1035, 1039 (Okl.Cr. 1976). Thus, a fair probability existed that items involved in the crime would be found there. Furthermore, the magistrate was provided with sufficient information to conclude that the requested blood, hair and saliva samples would be probative in the prosecution of the case. *See Pyle v. State*, 645 P.2d 1390, 1391 (Okl.Cr.1982).[3]

Finally, Appellant contends he was denied effective assistance of counsel because defense counsel failed to move to suppress the arrest, the searches and the evidence obtained there from. Appellant has failed to show that his counsel's performance was deficient and that his deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Therefore, this assignment of error fails.

In his second allegation of error, Appellant asserts he was denied due process by the late disclosure of critical hair evidence and the overstatement by the testifying expert as to the reliability of hair evidence. Appellant further maintains that hair evidence is unreliable and should not be allowed in any case.

Defense counsel objected to the testimony of Mary Long, one of the State's hair experts, on the grounds that the report she turned over to defense counsel was inaccurate and misleading. The challenged report stated that a pubic hair found in the victim's vagina and a scalp hair found in the pubic combing were not Caucasian hairs. Just before Long testified, defense counsel was informed that Long would testify she had macroscopically compared the hairs with the victim's hair and determined they were consistent. Appellant maintains this omission devastated his defense that a third party raped and murdered the victim. Appellant equates this omission to the circumstances found in *McCarty v. State*, 765 P.2d 1215 (Okl.Cr.1988). We are not persuaded by this argument.

3. Appellant cites *Cole v. Parr*, 595 P.2d 1349 (Okl.Cr.1979) in support of his contention that there was an insufficient showing of probable cause to support the warrant compelling him to give blood, hair and saliva samples. The present

case is distinguishable in that the information which was to be elicited during the evidentiary hearing discussed in *Cole* had already been presented to the judge by means of the affidavits. *See Pyle*, 645 P.2d at 1391.

In *McCarty,* the State's hair expert failed to complete her examination and report until Friday, March 14, for a trial that was scheduled to begin on Monday, March 17. The defendant had requested he be provided with all scientific and technical reports (hair, fiber, fingerprint, and serology samples). so that they could be independently evaluated by his own expert. The defense's expert did not receive the hair slides and forensic report until the first day of trial. As a result, the defendant was deprived of the opportunity to have critical hair evidence examined by an independent forensic expert. The error was further compounded by a critical omission in the forensic report. The report reflected that none of the pubic hairs found on the victim were consistent with the defendant. However, at trial the State's expert admitted that she had failed to include in the report her conclusion that a pubic hair found on the victim was consistent with that of the defendant.

■ In the present case, the defense never requested the hair evidence be submitted to a defense expert for independent examination. Furthermore, there is no evidence that Long's examination of the evidence and report were done at the last minute.[4] Nor does it appear from the record that Ms. Long was unavailable to speak with defense counsel or defense investigators prior to trial in order to verify and/or clarify her findings. Finally, unlike *McCarty,* information which was incriminating in nature was not withheld from Appellant. The report simply indicated that the two hairs in question were not Caucasian. The victim was Indonesian. Her hair would be of a Mongoloid classification. Consequently, a finding that the hairs were not Caucasian did not eliminate the possibility that the hairs were hers. While it would have been helpful to the defense had the hairs not been consistent with either Appellant or the victim, Ms. Long's testimony that the hairs were consistent with the victim was neither incriminatory or exculpatory. Contrary to Appellant's assertions on appeal, this evidence did not devastate his defense.

■ Appellant next contends Ms. Long overstated the reliability of hair evidence. A review of the record reflects Ms. Long properly testified about the limitations of hair evidence. *Crawford v. State,* 840 P.2d 627, 636 (Okl.Cr.1992). Long testified that positive identification of an individual cannot be accomplished by hair evidence alone. On cross-examination, Long agreed "you can never identify a person with a hair, saying that it absolutely belongs to a specific person." Ms. Long added that "[w]e would say that it's consistent with the known hairs of that person."

Appellant also asks this Court to find that hair comparison evidence is inherently unreliable. This Court has consistently rejected this argument. *Salazar v. State,* 852 P.2d 729, 736 (Okl.Cr.1993); *Driskell v. State,* 659 P.2d 343, 356 (Okl.Cr.1983). We need not address this issue again.

Appellant submits in his third assignment of error that the evidence was insufficient to support his convictions for first degree murder and first degree rape. Appellant argues the evidence failed to show that he was present at the time the crimes occurred or that he was the person who actually committed the crimes. Because the State relied solely upon circumstantial evidence to prove Appellant raped and murdered Sugeng, Appellant contends the evidence must exclude every reasonable hypothesis except guilt. *Hill v. State,* 898 P.2d 155, 166 (Okl.Cr.1995). However, because Appellant testified at trial, the State argues the standard of review established in *Spuehler v. State,* 709 P.2d 202, 203 (Okl.Cr.1985)[5] is applicable. *Mayes v. State,* 887 P.2d 1288, 1303 (Okl.Cr.1994), *cert. de-*

---

4. Defense counsel's copy of Ms. Long's report was dated March 18, 1994. Appellant's trial began on January 9, 1995.

5. Pursuant to *Spuehler,* the standard of review for sufficiency of evidence claims is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. When applying this test, the Court will not only view the evidence in the light most favorable to the State, but will also accept all reasonable inferences and credibility choices that tend to support the jury's verdict. *Williams v. State,* 721 P.2d 1318, 1320 (Okl.Cr.1986).

*nied,* 513 U.S. 1194, 115 S.Ct. 1260, 131 L.Ed.2d 140 (1995).

The defendant in *Mayes* testified at trial. On appeal, this Court concluded that not only must the State's evidence be considered, but the evidence presented by the defendant must also be taken into consideration when determining whether sufficient evidence was presented to convict. The defendant in *Mayes* did not claim to be present at the time of the murder but, instead, asserted an "I wasn't there—somebody else did it" defense. The Court rationalized that if the defendant's story was true there was no need for applying the test, and the defendant should be exonerated. If the defendant's story was false then the circumstantial evidence was not consistent with innocence and could be viewed as excluding every reasonable hypothesis other than guilt. *Mayes,* 887 P.2d at 1303.

■ However, in *Hill,* 898 P.2d at 166, this Court employed the reasonable hypothesis test when the State relied on circumstantial evidence to prove its case even though the defendant had taken the stand. In *McCarty v. State,* 904 P.2d 110, 119 (Okl.Cr. 1995), the Court similarly employed the reasonable hypothesis test when the State's evidence was circumstantial and the defendant had made statements to police and third parties. Thus, it appears that unless a defendant's testimony includes actual direct evidence of the crime,[6] the reasonable hypothesis test should be applied when the State's case is solely circumstantial.

■ As the State's case consisted of circumstantial evidence and Appellant's testimony was not direct evidence, the reasonable hypothesis standard should be applied in this case. Applying this standard, we find there was sufficient evidence to convict Appellant of the crimes charged. The victim was found by friends shortly after the rape and murder occurred. The victim was face down in her bathtub. She had been raped and then either strangled or drowned. She had bruises

on her cheek, inner lips and under her chin. There was a contusion on her chest and bruising on her hips, both injuries being consistent with weight bearing down on those areas of the body. She had a laceration just outside her vagina and one inside her vagina near the area of the hymen. The injuries to the vaginal area were consistent with blunt force trauma. In addition, injuries consistent with defensive wounds were found on the victim's hands, wrists and forearms.

Appellant's baseball cap was found in the living room. Appellant's semen was found on vaginal swabs taken from the victim, and a stain on the victim's bed contained both the victim's blood and Appellant's semen. Hairs consistent with Appellant's were also found at the crime scene. Finally, Appellant was less than forthright with law enforcement officials concerning his contact with the victim before her death. Appellant initially stated that he had never been past the front door entry way of the victim's apartment.

The above described evidence is more than sufficient to support Appellant's rape and murder convictions. The violent nature of the sexual encounter combined with the victim's subsequent murder would allow a jury to find that Appellant did not have consensual intercourse with the victim and that he killed her with malice aforethought.[7]

■ In his fourth assignment of error, Appellant submits the trial court erred when it permitted the State to introduce Latina Harjono's preliminary hearing testimony at trial in lieu of live testimony. Before prior testimony may be admitted into evidence the State, with the discretion of the trial court, must satisfy two threshold requirements: "(1) [t]he actual unavailability of the witness despite good faith and diligent efforts to secure the presence of the witness at trial; and, (2) the transcript of the witness' testimony bears a sufficient indicia of reliability to afford the trier of fact a satisfactory basis for evaluating the truth of the prior testimo-

---

6. "Direct evidence is that which points immediately to the question at issue, and which, if believed, proves the existence of the fact in issue *without inference or presumption.*" *Mayes,* 887 P.2d at 1301 (emphasis added).

7. "A design to effect death is inferred from the fact of killing, unless the circumstances raise a reasonable doubt whether such design existed." 21 O.S.1991, § 702.

ny." *McCarty,* 904 P.2d at 128 (*quoting Smith v. State,* 546 P.2d 267, 271 (Okl.Cr. 1976)). . Appellant submits in the instant case that the State failed to satisfy either threshold requirement.

▮ Relying upon *Simpson v. State,* 780 P.2d 711, 712–13 (Okl.Cr.1989) and *Holmes v. State,* 501 P.2d 830, 832–33 (Okl.Cr.1972), Appellant first contends the State failed to use due diligence to secure Ms. Harjono's presence at trial. We disagree. In both *Simpson* and *Holmes,* the State expended no effort to secure the witnesses' attendance at trial beyond the issuance of a subpoena. Such is not the case here.

Ms. Harjono was a senior at Oklahoma State University at the time the Information was filed. The trial was originally scheduled for June 20, 1994, and Ms. Harjono was subpoenaed to appear on that date.[8] When the trial was subsequently rescheduled for January 9, 1995, the State issued new subpoenas. It was at this time that the State discovered Ms. Harjono had left the county. Thereafter, deputies from the Payne County Sheriff's Office and the prosecutor attempted to locate Harjono, without success. Based on information that Harjono had moved to Los Covina, California, the prosecutor contacted a law enforcement agency in that area. The prosecutor also contacted friends of Harjono in an attempt to locate her. The prosecutor was advised on two separate occasions by friends of Harjono that Harjono was gone and they did not know where she had moved.

Although the State may not have exhausted every possible avenue for locating Ms. Harjono,[9] this fact alone does not foreclose a finding that the State's attempts to secure Ms. Harjono were diligent and conducted in good faith. *See McCarty,* 904 P.2d at 128.

▮ Appellant asserts next that Ms. Harjono's preliminary hearing testimony failed to meet the standards of reliability necessary to permit its use in accordance with the Sixth Amendment and due process. Appellant submits Ms. Harjono's testimony lacks a sufficient indicia of reliability because he did not have an adequate opportunity to cross-examine her at preliminary hearing. Since Ms. Harjono was the first witness called to testify at preliminary hearing, Appellant contends defense counsel did not have the benefit of other witnesses' testimony to use during cross-examination.

Contrary to Appellant's assertion, we find Appellant had ample opportunity to cross-examine Ms. Harjono. Furthermore, Harjono's testimony was given under circumstances which closely approximated those of a typical trial. Her testimony was made under oath and in a truth-inducing courtroom atmosphere. *See Howell v. State,* 882 P.2d 1086, 1091 (Okl.Cr.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1968, 131 L.Ed.2d 858 (1995). Appellant has failed to demonstrate the trial court abused its discretion when it permitted Ms. Harjono's preliminary hearing testimony to be read into evidence. This assignment of error fails.

▮ Appellant claims in his fifth assignment of error that law enforcement personnel failed to adequately preserve and examine evidence. Appellant submits law enforcement personnel's ineptness and total disregard for conducting an adequate investigation is tantamount to a bad faith denial of potentially exculpatory evidence. We disagree. In *Arizona v. Youngblood,* 488 U.S. 51, 58, 109 S.Ct. 333, 334, 102 L.Ed.2d 281 (1988), the United States Supreme Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *See also Hogan v. State,* 877 P.2d 1157, 1161 (Okl.Cr.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1154, 130 L.Ed.2d 1111 (1995). Appellant has failed to demonstrate that law enforcement acted in bad faith in the present case. This assignment of error fails.

In his sixth assignment of error, Appellant contends the trial court erred in admitting photographs of his chest and wrist over defense counsel's objections. The photographs were taken while Appellant was in custody.

---

8. The return of service indicating Ms. Harjono received the subpoena was dated May 17, 1994.

9. In his brief, Appellant list several tracking options he believes the State should have utilized.

They were obtained without his consent or a search warrant. As a result, Appellant maintains the photographs were taken in violation of his Fourth and Fourteenth Amendment rights.

Appellant was taken into custody on October 28, 1993, pursuant to an arrest warrant. He was then transported to Stillwater Medical Center where hair, blood and saliva samples were taken pursuant to valid search warrants. The contested photographs were taken the next day at the county jail by Officer Randy Dickerson. The challenged photographs were of Appellant's wrist and chest.

There are two different levels on which the Fourth Amendment may be violated when obtaining physical evidence from a person: (1) the seizure of the person necessary to bring him into contact with government agents; and (2) the subsequent search for and seizure of the evidence. *Woolverton v. Multi–County Grand Jury*, 859 P.2d 1112, 1114 (Okl.Cr.1993). The first level of Fourth Amendment analysis is not violated in the present case as probable cause to arrest Appellant had already been established when the arrest warrant was obtained.

■ As to the second level of analysis, we find the photographs taken of Appellant's wrist and chest did not constitute a search and/or seizure as contemplated by the Fourth Amendment or Oklahoma Constitution. A person's wrist and chest are areas that are readily visible to the public especially in a jail/prison environment. Appellant's wrist and chest were undoubtedly visible when Appellant was processed into the county jail after his arrest.[10] Furthermore, the photographing of these areas did not involve an intrusion into the body or personal privacy of Appellant, nor did it involve probing into Appellant's private life and thoughts. *See United States v. Dionisio*, 410 U.S. 1, 15, 93 S.Ct. 764, 772, 35 L.Ed.2d 67 (1973). *See also Harjo v. State*, 882 P.2d 1067, 1073 (Okl.Cr.1994), *cert. denied*, — U.S. —, 115 S.Ct. 2007, 131 L.Ed.2d 1007 (1995);

*Woolverton*, 859 P.2d at 1116. Consequently, this assignment of error fails.

### ISSUES RELATING TO SENTENCING STAGE

During sentencing stage deliberations, the jury sent out a note which asked if life without parole was given, was there "any possibility of Mr. Mollett's ever leaving prison for any reason whatsoever?" The judge advised the jurors that matters of parole were beyond the purview of the jury or the court to consider. In his seventh assignment of error, Appellant contends the trial court's response was improper and constituted error.

■ Although a jury may logically consider the possibility or absence of parole in determining the sentence a capital murder defendant is to receive, there is no requirement for a trial judge to explain the Oklahoma parole process to a jury. *Mayes*, 887 P.2d at 1318. *See also McCracken v. State*, 887 P.2d 323, 334 (Okl.Cr.1994), *cert. denied*, — U.S. —, 116 S.Ct. 166, 133 L.Ed.2d 108 (1995); *McGregor v. State*, 885 P.2d 1366, 1383 (Okl.Cr.1994). "[T]he concept of parole is sufficiently clear to enable any rational juror to understand it without explaining it further." *Mayes*, 887 P.2d at 1318. Consequently, we find no error.

■ Appellant further submits the trial court improperly failed to follow the requirements of 22 O.S.1991, § 894, which provides:

After the jury have retired for deliberation, if there be a disagreement between them as to any part of the testimony or if they desire to be informed on a point of law arising in the cause, they must require the officer to conduct them into court. Upon their being brought into court, the information required must be given in the presence of, or after notice to the district attorney and the defendant or his counsel, or after they have been called.

The purpose of Section 894 is to "prevent communications from being made to the jury without the parties being present to protect

---

**10.** Contrary to Appellant's assertion, State's Exhibit 24 indicates that Appellant was wearing a short sleeved jumper when the photographs were

taken. Therefore, his wrist was visible for all to see.

their interests." *Smallwood v. State*, 907 P.2d 217, 237 (Okl.Cr.1995), *cert. denied,* —— U.S. ——, 117 S.Ct. 431, 136 L.Ed.2d 330 (1996). In the present case, the trial court's response imparted no additional knowledge or instruction to the jury. The trial court in effect refused to answer the jury's question. Therefore, error, if any, was harmless as no substantive answer to the jury's question was given. *See Smallwood*, 907 P.2d at 237–38.[11]

In his eighth assignment of error, Appellant submits the use of victim impact evidence at his sentencing proceeding violated his rights under the Eighth and Fourteenth Amendments. Appellant specifically contends: (1) the victim impact evidence fell outside the statutory guidelines; (2) the testimony improperly focused solely on the emotional impact of the crime; (3) victim impact evidence functions as an unconstitutionally vague and overbroad superaggravator; and (4) the trial court failed to instruct the jury on the legal effect that they were to give to the victim impact evidence.

As to Appellant's first contention, we find the evidence presented was appropriate victim impact evidence. Title 22 O.S.Supp.1983, § 984 provides:

> "Victim impact statements" means information about the financial, emotional, psychological, and physical effects of a violent crime on each victim and members of their immediate family, or person designated by the victim or by family members of the victim and includes information about the victim, circumstances surrounding the crime, the manner in which the crime was perpetrated, and the victim's opinion of a recommended sentence.

In *Cargle v. State*, 909 P.2d 806, 828 (Okl.Cr. 1995), *cert. denied,* —— U.S. ——, 117 S.Ct. 100, 136 L.Ed.2d 54 (1996), this Court concluded that "victim impact evidence should be restricted to those unique characteristics which define the individual who has died, the contemporaneous and prospective circumstances surrounding that death, and how those circumstances have financially, emo-

tionally, psychologically, and physically impacted on members of the victim's immediate family."

In the present case, the victim's sister, Sri Surjanti Sugeng, read a statement that she prepared on behalf of herself and her younger sister, Kiki. She also read a statement prepared by her mother. The statements were brief and demonstrated how the victim's death emotionally and psychologically effected the victim's immediate family members. *See Cargle*, 909 P.2d at 828. Thus, we find the victim impact evidence presented below falls within the nature of evidence contemplated by the Oklahoma Legislature.

Appellant contends next that the victim impact evidence improperly focused solely on the emotional impact of the victim's murder, to the exclusion of other factors statutorily permitted. Appellant argues that the statements at issue exceeded the "quick glimpse" of the victim's personal characteristics condoned by this Court in *Cargle*. We disagree. "[V]ictim impact evidence relating to the personal characteristics of the victim and the emotional impact of the crime on the victim's family is a relevant consideration of Oklahoma's capital sentencing juries." *Parker v. State*, 917 P.2d 980, 989 (Okl.Cr.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 777, 136 L.Ed.2d 721 (1997). Although the victim impact statements in the instant case did not touch on every possible manner in which the victim's death may have affected the survivors, the statements did present proper information regarding the uniqueness of the victim and the way her death affected her immediate family. This allegation fails.

Appellant submits next that victim impact evidence operates as an irrelevant, improper, nonstatutory "superaggravator" that will always be present in every capital case. Consequently, Appellant submits such evidence negates the narrowing function death penalty procedures are required to provide. This issue was addressed and rejected in *Cargle*,

---

11. Appellant additionally contends the State failed to provide a sufficient record for this Court to conduct its mandatory sentence review pursuant to 21 O.S.Supp.1991, § 701.13. This conten-

tion fails as no true communication with the jury occurred. The record presented is sufficient for appellate review.

909 P.2d at 826. We are not persuaded to revisit this issue again at this time.

■ Appellant contends the jury instructions failed to address victim impact evidence or its place in the sentencing decision. Thus, Appellant submits the jury was left to its own, unguided discretion to factor victim impact evidence into the equation. Appellant failed to request an instruction directing or limiting the use of victim impact evidence. Thus, he has waived all but plain error. Upon review of the jury instructions as a unit, we find the instructions fairly and accurately stated the applicable law. Thus, this proposition of error fails.

■ Appellant contends in his ninth assignment of error that the State presented insufficient evidence to support the finding that the murder was committed for the purpose of avoiding lawful arrest or prosecution. "To support a finding of this aggravating circumstance the State must prove the defendant killed in order to avoid arrest or prosecution." *Powell v. State*, 906 P.2d 765, 781 (Okl.Cr.1995), *cert. denied*, — U.S. —, 116 S.Ct. 1438, 134 L.Ed.2d 560 (1996). The defendant's intent is critical to this proof and can be inferred from circumstantial evidence. *Romano v. State*, 909 P.2d 92, 119 (Okl.Cr. 1995), *cert. denied*, — U.S. —, 117 S.Ct. 151, 136 L.Ed.2d 96 (1996); *Powell*, 906 P.2d at 781; *Cannon v. State*, 904 P.2d 89, 107 (Okl.Cr.1995), *cert. denied*, — U.S. —, 116 S.Ct. 1272, 134 L.Ed.2d 219 (1996). Furthermore, there must be a predicate crime, separate from the murder, for which the defendant seeks to avoid arrest or prosecution. *Romano*, 909 P.2d at 119; *Powell*, 906 P.2d at 781; *Cannon*, 904 P.2d at 107.

■ In the present case, sufficient evidence exists to exclude any reasonable hypothesis except that Appellant murdered the decedent to avoid arrest or prosecution for the underlying rape. As Appellant testified at trial, Appellant and the victim were acquaintances. As such, the victim would have easily been able to identify Appellant as her attacker. From this evidence alone, a rational jury could find Appellant killed the victim to avoid arrest for the rape.

Citing *Barnett v. State*, 853 P.2d 226 (Okl. Cr.1993), Appellant further contends the rape was not a separate predicate crime as the force used to accomplish the rape was a significant contributing cause of the victim's death, not a separate crime in itself. We disagree. The victim's death was not the direct and proximate result of the rape. The evidence demonstrates Appellant raped the victim then strangled and drowned her. The rape was a distinct and separate crime from the murder.

■ Appellant next submits that the evidence was insufficient to prove the "especially heinous, atrocious or cruel" aggravating circumstance. This aggravating circumstance is limited to those cases in which the State proves beyond a reasonable doubt that the murder was "preceded by torture or serious physical abuse, which may include the infliction of either great physical anguish or extreme mental cruelty." *Cheney v. State*, 909 P.2d 74, 80 (Okl.Cr.1995). On appeal, the standard of review is "whether there was any competent evidence to support the State's charge that the aggravating circumstance existed." *Bryson v. State*, 876 P.2d 240, 259 (Okl.Cr.1994), *cert. denied*, 513 U.S. 1090, 115 S.Ct. 752, 130 L.Ed.2d 651 (1995).

■ Sufficient evidence exists in the instant case to support a finding that the victim suffered serious physical abuse. The victim was beaten and raped while she was conscious. The medical examiner testified that the victim's body bore bruises and contusions on her face, inner lips, chest, and hips. In addition, a laceration was found in the victim's vagina which bled profusely at the scene and was the result of blunt force trauma. Although the medical examiner could not say with certainty that the laceration to the victim's vagina occurred while she was conscious, evidence at the scene supported a conclusion that such was the case. A blood stain on the bed contained both the blood of the victim and the semen of the Appellant. Furthermore, the victim had defensive wounds on her hands, wrist, and forearm. It is unlikely that the victim would have sustained these wounds had she been rendered unconscious.

The evidence further supports a finding that the victim suffered extreme mental torture. The brutal attack culminated with the victim being strangled in her bathtub. Although the medical examiner could not determine whether she died as a result of strangulation or drowning, he testified it may have taken over four minutes for the victim to have lost consciousness as a result of the choke hold. Thus, the victim's death was clearly not instantaneous.

The evidence was sufficient to demonstrate both serious physical abuse and mental torture. Consequently, this allegation of error fails.

 In his eleventh allegation of error, Appellant asserts reversible error resulted because the word "physical" was omitted from the phrase "conscious torture of the victim or serious physical abuse" in the jury instructions. The phrase "especially heinous, atrocious, or cruel" was defined by the trial court in Second Stage Instruction No. 48. (O.R.443) The instruction was identified as OUJI–CR 436. OUJI–CR 436 defines the phrase "especially heinous, atrocious, or cruel" to be "directed to those crimes where the death of the victim was preceded by torture of the victim or serious physical abuse." Appellant submits the omission of the word "physical" lowered the standard of proof for the State and rendered the instruction fatally defective. We disagree. The phrase "serious abuse" as used in this context is commonly interpreted as referring to physical abuse. *Richie v. State*, 908 P.2d 268, 278–79 (Okl.Cr.1995), *cert. denied*, —— U.S. ——, 117 S.Ct. 111, 136 L.Ed.2d 64 (1996). Furthermore, under the facts of this case, there was sufficient evidence of both conscious mental torture and physical abuse. Thus, error, if any, was harmless.

Appellant further contends in his twelfth assignment of error that the "especially heinous, atrocious or cruel" aggravator is still being applied and reviewed by this Court in an unconstitutional manner. In *Stouffer v. State*, 742 P.2d 562, 563 (Okl.Cr.1987), *cert. denied*, 484 U.S. 1036, 108 S.Ct. 763, 98 L.Ed.2d 779 (1988), this Court narrowed the interpretation of the "especially heinous, atrocious or cruel" aggravator by limiting its application to those instances of death which are preceded by torture or serious physical abuse. Since this time, we have repeatedly held that this sufficiently narrowed the class of murders to which the circumstance can be applied. *See Neill v. State*, 896 P.2d 537, 555 (Okl.Cr.1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 791, 133 L.Ed.2d 740 (1996); *Long v. State*, 883 P.2d 167, 174 (Okl.Cr.1994), *cert. denied*, 514 U.S. 1068, 115 S.Ct. 1702, 131 L.Ed.2d 564 (1995); *Revilla v. State*, 877 P.2d 1143, 1154–55 (Okl.Cr.1994), *cert. denied*, 513 U.S. 1096, 115 S.Ct. 764, 130 L.Ed.2d 661 (1995); *Woodruff v. State*, 846 P.2d 1124, 1146 (Okl.Cr.1993), *cert. denied*, 510 U.S. 934, 114 S.Ct. 349, 126 L.Ed.2d 313 (1993).

The jury in the present case was sufficiently instructed regarding the definition of the phrase "especially heinous atrocious or cruel." Thus, the jury's discretion was properly channeled in how to construe the aggravating circumstance.

In his thirteenth assignment of error, Appellant submits that errors in the second stage jury instructions denied him of his rights under the Eighth and Fourteenth Amendments to due process and a reliable sentencing proceeding. Appellant first contends that the trial court's instructions regarding the manner in which the jury was to weigh aggravating and mitigating circumstances set forth an improper burden of proof. This same allegation of error has been repeatedly rejected by this Court. *See Rogers v. State*, 890 P.2d 959, 977 (Okl.Cr.), *cert. denied*, —— U.S. ——, 116 S.Ct. 312, 133 L.Ed.2d 215 (1995); *McGregor*, 885 P.2d at 1384; *Mitchell v. State*, 884 P.2d 1186, 1206 (Okl.Cr.1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995); *Paxton v. State*, 867 P.2d 1309, 1327 (Okl.Cr.1993), *cert. denied*, 513 U.S. 886, 115 S.Ct. 227, 130 L.Ed.2d 153 (1994); *Trice v. State*, 853 P.2d 203, 215 (Okl.Cr.), *cert. denied*, 510 U.S. 1025, 114 S.Ct. 638, 126 L.Ed.2d 597 (1993). We do so here again.

Appellant next asserts the instructions given to the jury regarding mitigating circumstances were worded in permissive rather than mandatory language, and thus the jury could completely ignore mitigating circum-

stances if they chose to do so. We have repeatedly rejected this same argument. *LaFevers v. State,* 897 P.2d 292, 310 (Okl.Cr. 1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 820, 133 L.Ed.2d 763 (1996); *Walker v. State,* 887 P.2d 301, 322 (Okl.Cr.1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 166, 133 L.Ed.2d 108 (1995); *Mayes,* 887 P.2d at 1319–20; *Bryson,* 876 P.2d at 262; *Paxton,* 867 P.2d at 1326; *Pickens v. State,* 850 P.2d 328, 339 (Okl.Cr.1993), *cert. denied,* 510 U.S. 1100, 114 S.Ct. 942, 127 L.Ed.2d 232 (1994). We need not address this issue again.

Appellant further contends the trial court erred when it failed to instruct the jury that they could impose a life sentence even if they found that an aggravating circumstance exists. This contention has been consistently rejected by this Court. *LaFevers,* 897 P.2d at 308–9; *Neill,* 896 P.2d at 557; *Rogers,* 890 P.2d at 978; *Robedeaux v. State,* 866 P.2d 417, 435 (Okl.Cr.1993), *cert. denied,* 513 U.S. 833, 115 S.Ct. 110, 130 L.Ed.2d 57 (1994). We do so again.

Finally, Appellant asserts the jury instructions improperly failed to inform the jury that their finding of mitigating circumstances did not have to be unanimous. We have also previously addressed and rejected this contention. *LaFevers,* 897 P.2d at 309–10; *Scott v. State,* 891 P.2d 1283, 1297 (Okl.Cr.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 784, 133 L.Ed.2d 735 (1996); *Rogers,* 890 P.2d at 978; *Stiles v. State,* 829 P.2d 984, 997 (Okl.Cr. 1992). We need not address this issue again.

### CUMULATIVE ERROR REVIEW

In his final proposition of error, Appellant asks this Court to consider the cumulative effect of the alleged errors and grant relief even if the individual errors do not, in themselves, justify such action. As no error occurred which would require reversal or modification of this case, this proposition of error is denied. *Shelton v. State,* 793 P.2d 866, 877 (Okl.Cr.1990).

### MANDATORY SENTENCE REVIEW

■ In accordance with 21 O.S.1991, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of aggravating circumstances.

Upon review of the record, we cannot say Appellant's sentence of death was imposed because the jury was influenced by passion, prejudice or any other arbitrary factor contrary to Section 701.13(C). The evidence further supports the jury's finding of two aggravating circumstances—the murder was "especially heinous, atrocious or cruel" and the murder was committed to avoid lawful arrest or prosecution. The evidence in this case is clear.

Therefore, after carefully reviewing the record, we find the sentence of death to be factually substantiated and appropriate. Finding no error warranting reversal or modification, the Judgment and Sentence of the District Court of Payne County is **AFFIRMED.**

CHAPEL, P.J., and LUMPKIN, J., concur in result.

STRUBHAR, V.P.J., joins in CHAPEL's concurs in result.

LANE, J., concurs in part/dissents in part.

CHAPEL, Presiding Judge, concurring in result:

I concur in affirming the judgment and sentence in this case. However, as I have said before, I believe we should provide a meaningful answer to questions from the jury when they ask, as they often do, about the meaning of life without parole. See *Smallwood v. State,* 907 P.2d 217, 239 (Okl. Cr.1995) (Chapel, V.P.J., Specially Concurring). I am authorized to state that Vice Presiding Judge RETA STRUBHAR joins in this opinion.

LUMPKIN, Judge, concurring in result:

I agree that Appellant's convictions and sentences should be affirmed. I write separately because I do not agree with the standard of review the Court uses here to determine the sufficiency of the evidence.

I have previously stated my belief this Court should adopt a unified *Spuehler*-type

approach to evaluating the sufficiency of the evidence in all cases, whether they contain both direct and circumstantial evidence, or whether they contain entirely circumstantial evidence. *See White v. State,* 900 P.2d 982 (Okl.Cr.1995) (Lumpkin, J., specially concurring). I re-urge that here because this case presents a prime example why a unified approach would be clearer and more concise.

The opinion goes to great lengths showing its rationale as to why it should use the reasonable hypothesis test in this instance. Unfortunately, the evidence does not agree with the opinion's categorization.

Appellant took the stand and testified in his behalf. He testified that he had met the victim before, and that they had been sexually intimate in the past. The night the victim was killed, he was in the victim's apartment. They started kissing, and when "things started just escalating" they went to the bedroom, where they both got completely undressed and had consensual intercourse while lying on the corner of the bed. Appellant said he ejaculated in the victim. He also said he believed the victim may have been on her period. He offered this evidence to explain why his semen was found along with the victim's blood on the bed. After they had finished intercourse, a man of Indonesian nationality entered the apartment. He appeared angry at the victim and had a knife, which he jabbed at the Appellant, cutting him on the chest and arm, and drawing blood. Appellant said he tried to calm the man down, but was unsuccessful in doing so. He also noticed that the victim seemed upset. Appellant heard the intruder talking to a second man. When the intruder resumed arguing with the victim and pushed her to the floor, Appellant left, believing that the others could work things out if he were not there.

This is certainly direct evidence as to the rape; and as the state's theory was that he killed her to avoid prosecution for that rape, it should be direct evidence as to the murder. If the jury believed Appellant's version, they would not find him guilty of murder, as he would have no reason to kill the victim and he was not present when the murder was committed.

My point is this: the opinion goes to great lengths to differentiate cases attempting to interpret what kind of evidence is present in a case; and having decided that, which test should be used to determine if that evidence is sufficient. That is an exercise better left to scholars. If this Court adopted a unified approach to examining the sufficiency of the evidence, it could focus solely on the issue which should be before it: whether there was sufficient evidence for any rationale trier of fact to conclude beyond a reasonable doubt that a defendant committed each element of a crime.

There is another minor point. In addressing Appellant's complaint that search warrants were improperly issued, the opinion concludes that the magistrate "had a substantial basis for concluding that probable cause existed." I interpret the "substantial basis" language as being the same as saying the affidavit presented sufficient information to establish probable cause.

Accordingly, I concur in result.

LANE, Judge, concurring in part/dissenting in part.

I concur in affirming the judgment in this case, but dissent to affirming the sentence. The victim impact evidence offered in this case consisted of a statement a sister of the deceased gave on behalf of herself and her younger sister and a statement prepared by her mother. The mother and the younger sister did not testify. Their statements are authorized by title 22, section 984, which in my opinion only authorizes this type of statement to be given to the judge at the time formal sentence is pronounced. It is not authorized to be given to the jury. In addition, the statements of the mother and younger sister were not subject to cross-examination. See, my special vote in *Charm v. State,* 924 P.2d 754, 773 (Okl.Cr.1996).